

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 11, 2021

**VIA ECF AND EMAIL**
The Honorable Andrew L. Carter Jr.
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: *United States* v. *Leom Kolmnela*, 15 Cr. 685 (ALC) / 18 Cr. 554 (ALC)

Dear Judge Carter:

The Government respectfully opposes the motion filed on behalf of defendant Leom Kolmnela by his retained counsel seeking his compassionate release from prison under Title 18, United States Code, Section 3582(c)(1)(A). To date, Kolmnela has served five years and seven months of the 10-year prison sentence that this Court imposed on Kolmnela for his role as the leader of an international drug trafficking organization in orchestrating international shipments of 30 kilograms of methamphetamine and 114 kilograms of cocaine, collectively worth millions of dollars in street value.

Kolmnela's motion for release from prison now — which would constitute a 46% reduction of his sentence — is meritless. *First*, Kolmnela's motion fails to show, as is his burden, that he falls into the narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release. 18 U.S.C. § 3582(c)(1)(A). *Second*, even if Kolmnela had satisfactorily made that threshold showing — which is not the case — his early release from prison would still be inappropriate in light of the factors set forth in 18 U.S.C. § 3553(a) that sentencing courts must consider in fashioning an appropriate sentence for criminal defendants such as him. In any event, because Kolmnela will be taken into the custody of the United States Department of Homeland Security's Immigration and Customs Enforcement division for anticipated deportation proceedings that will likely result in his deportation, the relief that his motion seeks will not necessarily address the alleged concerns cited at the claimed bases for the motion.

For all of these reasons, and those set forth below, Kolmnela's motion should be denied.

## BACKGROUND

### A. Kolmnela's Offense Conduct

Leom Kolmnela, a 51-year-old citizen of Albania, was a leader of an international drug trafficking organization that transported multi-kilogram shipments of methamphetamine and cocaine to Australia for distribution. The criminal narcotics trafficking charges that were filed

against Kolmnela in this case stem from law enforcement seizures of a shipment of 30 kilograms of methamphetamine and a separate shipment of 114 kilograms of cocaine that Kolmnela orchestrated as part of his leadership of that drug organization, collectively worth millions of dollars in street value.

*The 30-Kilogram Methamphetamine Seizure*. On July 16, 2014, Kolmnela exported about 30 kilograms of methamphetamine from Los Angeles, California to Australia. The methamphetamine, in two 15-kilogram packages, was seized by Australian law enforcement from a hidden compartment in the trunk of a vehicle on September 4, 2014.

*The 114-Kilogram Cocaine Seizure.* In 2015, the United States Drug Enforcement Administration ("DEA") conducted an investigation that led to Kolmnela's arrest in the Southern District of New York. During the course of the investigation, the DEA made use of a confidential source posing as an international drug trafficker ("CS-1"), and another confidential source posing as a boat captain in the business of transporting drug shipments ("CS-2") via a 60-foot vessel (the "Vessel"). In February 2015, CS-1 participated in several telephone conversations with an employee of Kolmnela's drug organization, Mercedes Amelia Paez Brochero, who was seeking to hire a marine vessel on behalf of Kolmnela to transport a shipment of cocaine from Colombia to Australia. During these conversations, Brochero arranged to meet in Aruba with CS-1 in order to inspect the Vessel.

On February 19, 2015, Brochero met in Aruba with CS-1 (posing as an international drug trafficker) and CS-2 (posing as the boat captain of the Vessel). During the meeting, Brochero inspected the Vessel in the presence of CS-1 and CS-2. CS-1 introduced CS-2 to Brochero as the purported boat captain of the Vessel. Brochero said her boss, "Leo," who was later identified as defendant Leom Kolmnela, was based in the United States and wanted to hire a marine vessel to transport a large shipment of cocaine from Colombia to Australia. Brochero used her cellphone to call Kolmnela, had a brief conversation with Kolmnela in which Brochero said that the Vessel was suitable to hire, and then handed her cellphone to CS-1, who spoke directly with Kolmnela. During CS-1's conversation with Kolmnela, Kolmnela agreed to pay CS-1 and CS-2 a transportation fee of about $5,000 per kilogram of cocaine to be transported (which would equate to a total transportation fee of $570,000 to ship 114 kilograms of cocaine).

On April 8, 2015, CS-1 participated in a conversation with Brochero via encrypted WhatsApp communications with CS-1 in which Brochero stated that the cocaine to be shipped via the Vessel would be delivered at a location in Colombia the next morning. On April 9, 2015, a vehicle arrived at the agreed upon location in Colombia. The vehicle was driven there by an individual later identified as Leke Lleshi, a/k/a "El Calbo," who was in the driver's seat of the vehicle, and the vehicle had several passengers, including Brochero and an individual who exited the vehicle with two suitcases ("FNU LNU"). FNU LNU delivered the two suitcases to CS-1 at the agreed upon location in Colombia on behalf of Brochero and her boss, Kolmnela. Colombian law enforcement officials subsequently seized and searched the suitcases, which contained approximately 114 brick-shaped packages containing approximately 114 kilograms of cocaine. During a subsequent WhastsApp conversation, CS-1 told Brochero that the cocaine had been received, and that CS-2 would commence the shipment of the cocaine from Colombia to Australia

via the Vessel. In reality, however, the cocaine was never loaded onto the Vessel, and the Vessel never left for Australia.

Based on the pretense that the Vessel was at sea, on its way to Australia with the cocaine shipment described above, CS-1 arranged to have Brochero set up a meeting in the Southern District of New York between CS-1 and Brochero's boss, Kolmnela, in order to discuss payment of the transportation fee for the cocaine shipment. Specifically, CS-1 said that CS-1 planned to be in New York City during the third week of June 2015, and asked Brochero to arrange a meeting in New York City between CS-1 and Kolmnela to discuss their current business and future business.

On June 18, 2015, at the direction of law enforcement, CS-1 met with Kolmnela at a restaurant in New York, New York. During the meeting, Kolmnela introduced himself as "Leo" and discussed the cocaine that Kolmnela had agreed to pay CS-1 and CS-2 to ship via the Vessel from Colombia to Australia. For example, Kolmnela said that "El Calbo," which CS-1 understood as a reference to Lleshi, had failed Kolmnela, in that Kolmnela had been hoping to ship over 300 kilograms via the Vessel to Australia, and Lleshi had only supplied about 114 kilograms for the shipment. Kolmnela also discussed his drug trafficking business around the globe. For example, CS-1 asked if Kolmnela's business involved the trafficking of clothing impregnated with "perico," which is slang in Spanish for cocaine. Kolmnela acknowledged that he had done so in the past, but he did not need to do so anymore because Kolmnela expected to make future shipments using CS-1 and CS-2's shipment services via the Vessel. Kolmnela also said he liked to do business in Australia, where the market price of "la mercancia," which is also slang in Spanish for cocaine, is higher than in other countries. Kolmnela discussed the payment of the $570,000 transportation fee for the cocaine shipment referenced above. For example, CS-1 said that CS-1 needed to receive a substantial portion of the transportation fee before the Vessel arrived in Australia. Kolmnela agreed to meet again with CS-1 in New York to provide a down payment of about $300,000 in cash towards the transportation fee.

On June 19, 2015, at the direction of law enforcement, CS-1 had a further meeting with Kolmnela at a hotel in New York, New York. During the meeting, with respect to the transportation fee, Kolmnela agreed to pay the fee by making several wire transfers of tens of thousands of dollars to CS-1, and to have his associates in Colombia provide thousands of dollars in cash (in pesos) in Colombia to CS-1. At the conclusion of this meeting, Kolmnela was placed under arrest by DEA agents and he was subsequently charged in this case, presented in the Southern District of New York and detained pending trial.

B. **Kolmnela's Guilty Plea**

On September 18, 2018, Kolmnela pleaded guilty to Count One of Indictment 15 Cr. 685 (ALC), which charged him with conspiring to possess with the intent to distribute five kilograms and more of cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506 and 21 U.S.C. § 960(b)(1)(B), based on his role in orchestrating the shipment of 114 kilograms of cocaine that was seized by Colombian law enforcement. As part of the same plea proceeding, Kolmnela resolved a separate criminal case that had been filed against him in the United States District Court for the Central District of California in connection with his role in orchestrating the shipment of 30 kilograms of

methamphetamine that was seized by Australian law enforcement. In connection with the California case, which was transferred to this Court, Kolmnela pleaded guilty to Count One of Indictment 18 Cr. 554 (ALC), which charged him with exporting approximately 30 kilograms of methamphetamine from the United States, in violation of 21 U.S.C. §§ 953(c), 960(a)(1), and 960(b)(1)(H), and of 18 U.S.C. § 2. Each of the charges to which Kolmnela pleaded guilty carried a mandatory minimum prison sentence of ten years.

### C. Kolmnela's Sentencing

After Kolmnela pleaded guilty to Count One of Indictment 15 Cr. 685 (ALC) based on the 114-kilogram cocaine seizure and Count One of Indictment 18 Cr. 554 (ALC) based on the 30-kilogram methamphetamine seizure, the parties jointly moved to vacate Kolmnela's guilty plea to the former charge as no longer valid in light of the Second Circuit's intervening decision in *United States* v. *Prado*, 333 F. 3d 121 (2d Cir. 2019), with the proviso that the Court would be permitted to consider the misconduct underlying the former charge as relevant conduct in sentencing Kolmnela on the latter charge, which remained valid. (Sent'g Tr. (D.E. 93) at 1-6). The Court granted that joint motion. (*Id.*)

On December 6, 2019, the Court sentenced Kolmnela to ten years in federal prison on Count One of Indictment 18 Cr. 554 (ALC) to be followed by five years of supervised release, "[e]ven though it is likely that Mr. Kolmnela will be deported" after serving that prison term. (*Id.* at 20). Kolmnela has been in federal custody since his arrest in June 2015. He is currently incarcerated at the Correctional Institution Moshannon Valley ("CI Moshannon Valley") in Pennsylvania, a privately-managed prison facility run by the GEO Group, Inc. pursuant to a contract with the Federal Bureau of Prisons ("BOP"). Kolmnela's current projected release date is December 26, 2023 assuming he receives good time credit.

### D. Kolmnela's BOP Medical Records

The Government has received BOP medical records for Kolmnela, a copy of which are enclosed as Exhibit A under cover of a separate letter requesting that those records be filed under seal. A review of those BOP medical records reveals that Kolmnela is in relatively good health for his age. To be sure, those records confirm that Kolmnela has pre-existing nasal allergies and indicate that Kolmnela has unspecified "cardiac risk factors" (*see, e.g.*, Ex. A at 2/177), a phrase which appears to be based on the fact that he has slightly elevated cholesterol. But both of those conditions are relatively mild and the BOP medical staff appears to be tendering appropriate care to manage them.

With respect to Kolmnela's nasal allergies, his BOP medical records show that Kolmnela has allergic rhinitis (*see id.*), which is more commonly known as hay fever. Those with such nasal allergies generally experience symptoms (such as a runny or stuffy nose, sneezing, or watery eyes) after breathing an allergen (such as pollen, dust or mold). Allergic rhinitis is treatable with a variety of remedies, including by taking nasal sprays (of corticosteroids or antihistamines) or by taking steps to avoid exposure to the allergens that trigger symptoms. According to Kolmnela's medical records, he has been proscribed mometasone and ipratropium nasal sprays to treat his allergic rhinitis. (*See, e.g.*, *id.* at 3-4/177).

Kolmnela's BOP medical records also include vague and conclusory references to him having "cardiac risk factors[.]" (*See, e.g.*, *id.* at 5/177). This term appears to be based on the fact that lab results from a blood test in February 2020 revealed that Kolmnela had an "LDL" cholesterol level of 104 (*see id.* at 104), which is slightly above the optimal LDL level. According to guidance published by the Centers for Disease Control and Prevention (the "CDC"), high levels of low-density lipoproteins, or "LDL," which is sometimes called "bad" cholesterol, can result in LDL cholesterol building up on the walls of a person's blood vessels, increasing the risk of angina (chest pain) or heart attack. Although the BOP conservatively categorized Kolmnela's LDL cholesterol level as "high" (*see id.* at 105/177), a widely used online medical resource indicates that an LDL level within the range of 100 to 129 (such as Kolmnela's LDL score) is "Near or above optimal" and is preferable to LDL ranges of 130 to 159 ("Borderline high"), 160 to 189 ("High"), and 190 and above ("Very high"). *See* WebMD Website, LDL Cholesterol, available at https://www.webmd.com/heart-disease/ldl-cholesterol-the-bad-cholesterol#1 (last visited Jan. 8, 2021). For Kolmnela's slightly elevated LDL cholesterol level, BOP medical staff has at times instructed Kolmnela to take 81 milligrams of aspirin per day for specified periods, a low-dose prescription commonly used to thin a patient's blood to prevent a heart attack or stroke.

Kolmnela's BOP medical records also reveal the following of relevance to the instant motion. During a BOP clinical evaluation on February 19, 2020, which was before the President declared a national emergency relating to the COVID-19 pandemic, BOP medical staff found that Kolmnela's sinuses, lung, chest, heart and vascular system were all "Normal" (*see* Ex. A at 6/177), and Kolmnela said "Im [*sic*] good" (*id.*). On September 19, 2020, which was several months into the pandemic, Kolmnela refused a prescription for aspirin despite the risk that this might increase his "cardiac risk factors[.]" (*Id.* at 25/177). On December 9, 2020, Kolmnela requested a sick call appointment, claiming he had throat pain and a heavy cough. On December 11, 2020, Kolmnela was examined by BOP medical staff, was tested for COVID-19 and strep throat, and was proscribed 640 milligrams of Tylenol every six hours for 30 days for his symptoms, and 81 milligrams of aspirin per day for 42 days to mitigate his cardiac issues. (*See id.* at 58, 65-66/177). According to the lab results from those tests, Kolmnela tested negative for COVID-19 but had positive for strep throat, and he was subsequently prescribed 500 milligrams of the antibiotic amoxicillin per day for 10 days to treat his strep. (*See id.* at 58, 99-100/177). During a follow-up physical examination on December 15, 2020, Kolmnela was asked about and denied having any cardiopulmonary issues (specifically, he denied having any chain pain, shortness of breath, cough, or coughing up blood), he was asked about and denied having other symptoms of COVID-19, his heart rate was regular, and he was calm and cooperative. (*See id.* at 59-60/177).

**E. Kolmnela's Compassionate Release Motion**

On October 26, 2020, Kolmnela submitted a request to the facility administrator at CI Moshannon Valley for compassionate release from prison. On October 28, 2020, the facility administrator denied Kolmnela's request. On January 5, 2021, Kolmnela filed the instant motion (D.E. 17) with this Court for compassionate release pursuant to 18 U.S.C. § 3582(c).

# ARGUMENT

Although Kolmnela has exhausted his administrative remedies within the BOP as required for the Court to consider his compassionate release motion, his motion should be denied on the merits because he has failed to demonstrate that he falls into the narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release from prison, and because the sentencing factors set forth in Section 3553(a) weigh against reducing his sentence.

### A. Applicable Law

Under Title 18, United States Code, Section 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). A motion under this provision may be made by either by the Bureau of Prisons or by a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id*.

Section 3582(c)(1)(A) provides that a district court may reduce a sentence if the court finds, "after considering the factors set forth in [S]ection 3553(a) [of Title 18 of the United States Code] to the extent they are applicable," that "extraordinary and compelling reasons warrant such a reduction" and that the reduction "is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The relevant policy statement appears at U.S.S.G. § 1B1.13, and the Application Notes to that section describe multiple ways that a defendant can show "extraordinary and compelling reasons," including by demonstrating a sufficiently serious and enduring medical condition "that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility." U.S.S.G. § 1B1.13, Application Note 1. The Second Circuit recently clarified that U.S.S.G. § 1B1.13 "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" when deciding compassionate release motions, and that "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" *United States* v. *Brooker*, No. 19-3218-Cr, 2020 WL 5739712, at *8 (2d Cir. Sept. 25, 2020) (quoting 28 U.S.C. § 994(t)).

"The existence of 'extraordinary and compelling reasons' for a reduction does not mean that a district court *must* release the defendant." *See United States* v. *Madoff*, No. 09 Cr. 213, D.E. 230 (Memorandum Decision) at 9 (S.D.N.Y. June 4, 2020) (Chin, J.) (Judge Chin's emphasis), citing *United States* v. *Ebbers*, No. S4 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020) ("the existence *vel non* of 'extraordinary and compelling reasons' determines only whether a defendant can be considered for release—the existence of such reasons does not mandate release"). "Rather, section 3582(c)(1)(A) provides that a court 'may' reduce a sentence if 'extraordinary and compelling circumstances' are shown, and thus a district court has the discretion to grant or deny a request for compassionate release even if a defendant is medically

eligible." *See Madoff*, No. 09 Cr. 213, D.E. 230 at 9 (citing authority). "If a defendant qualifies for a reduction, the court must decide whether to grant the reduction by weighing the factors set forth in section 3553(a), to the extent they are applicable." *See id.* (citing authority). The Section 3553(a) factors include the nature and circumstances of the defendant's offense; the defendant's history and characteristics; and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a).

"On a motion for compassionate release, the defendant bears the burden of showing that a reduction is warranted." *Madoff*, No. 09 Cr. 213, D.E. 230 at 9 (collecting cases); *see also United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

### B. The BOP and COVID-19

The BOP has made and continues to make significant efforts to respond to the threat posed by COVID-19.

Since at least October 2012, the BOP has had a Pandemic Influenza Plan. *See* BOP Health Management Resources, available at https://www.bop.gov/resources/health_care_mngmt.jsp. In January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* BOP COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. As part of its Phase One response, the BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, the BOP stood up "an agency task force" to study and coordinate its response, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On or about March 13, 2020, the BOP implemented its Phase Two response "to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, the BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, the BOP implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its

infectious disease management programs. *Id.* As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

On or about March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See* BOP Update on COVID-19, available at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

On or about March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. *See* BOP COVID-19 Action Plan: Phase Five, available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

On or about April 1, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. *Id.*

On or about April 14, 2020, the BOP commenced Phase Six, which included extending all Phase Five measures until May 18, 2020. *See* BOP COVID-19 Action Plan: Phase Six, available at https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf. On May 18, 2020, the BOP extended all measures from Phase Six, to include measures to contain movement and decrease the spread of the virus, through June 30, 2020. *See* COVID-19 Action Plan: Phase Seven, available at https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp.

The BOP has also "increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement." *See* Update on COVID-19 and Home Confinement, available at https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp. In addition, the BOP "has begun immediately reviewing all inmates who have COVID-19 risk factors, as

described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities [with COVID-19 outbreaks] to determine which inmates are suitable for home confinement." *Id.*

As of today, CI Moshannon Valley, which houses approximately 1,642 inmates, has reported that 13 of its inmates tested positive for COVID-19 in the prison's most recent round of COVID-19 testing, representing less than 1% of its inmate population. In the ten months that have passed since the beginning of the COVID-19 pandemic, CI Moshannon Valley reportedly has had a total of 176 inmates test positive for COVID-19, 174 of whom have since recovered, and two of whom passed away.

The above-described steps taken by the BOP belie any suggestion that the BOP is failing to address meaningfully the risk posed by COVID-19 to inmates. To the contrary, they show that the BOP has taken the threat seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations of medical experts.

**C. Discussion**

Kolmnela's motion for compassionate release should be denied for at least two independent reasons. *First*, the defendant has failed to establish "extraordinary and compelling" reasons warranting his release. *Second*, release would be inconsistent with the factors set forth in 18 U.S.C. § 3553(a).

**1. Kolmnela Has Failed to Establish "Extraordinary and Compelling" Reasons Justifying His Early Release From Prison**

Kolmnela's motion for immediate release from prison is based primarily on his claims that he is at a heightened risk of suffering severe complications if he were to contract COVID-19 in prison because he is 51 years old, has pre-existing nasal allergies (specifically, allergic rhinitis) and unspecified "cardiac risk factors" (D.E. 17 at 6), a vague and conclusory phrase drawn from Kolmnela's BOP medical records that appears to be based on Kolmnela's slightly elevated cholesterol.

As shown above, all of those pre-existing conditions are relatively mild, and neither them nor Kolmnela's age are sufficiently "extraordinary and compelling" to justify his early release from prison. Since the beginning of the global COVID-19 pandemic in early 2020, medical experts at the CDC have been studying the growing body of available data on COVID-19 to understand (among other things) the comorbidities that render individuals more susceptible to serious illness from COVID-19. Based on the latest guidance from the CDC, none of the pre-existing conditions cited by Kolmnela are recognized by the CDC on its list of medical conditions that create an increased risk of severe complications from COVID-19, nor are any of them on the CDC's list of medical conditions that might create an increased risk of severe complications from COVID-19. *See* CDC Website, People with Certain Medical Conditions, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (Dec. 29, 2020). Further, while the CDC recognizes that the risk of hospitalization from COVID-19 increases with age, the CDC has identified the age of 65 or older as the group of

older adults at heightened risk of severe complications if they contract COVID-19, and Kolmnela (at age 51) is significantly younger than that group of older adults. *See* CDC Website, Older Adults, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (Dec. 13, 2020).

As a fall-back claim, Kolmnela argues that he should be released from prison so that he can care for his wife, who has been suffering from unpredictable fainting spells. (D.E. 17 at 1, 6). The Government is sympathetic to Kolmnela's wife's circumstances, which are unfortunate. But they do not rise to the level of "extraordinary and compelling" reasons for his early release, as required for him to prevail on his motion. While there is no dispute that it would be easier for his family to care for his wife if he were home with them, that does not mean that his early release from prison is critical and necessary for his family to do so. In this regard, Kolmnela's motion fails to allege any facts or proffer any evidence showing that his family is unable to cope with his wife's circumstances in his absence. The absence of such allegations and proof is telling, as the Kolmnela family appears to have significant Customs wealth, resources and assets. According to the final Presentence Investigation Report (at ¶¶ 66-71) prepared by the Probation Department in advance of Kolmnela's sentencing in 2019 (the "PSR"), Kolmnela and his family as of that time owned multiple companies that had collectively generated hundreds of thousands of dollars in revenues, and owned six real estate properties in Florida. As such, Kolmnela's wife would presumably have the financial means to hire a health aid or caretaker (either out of pocket or through insurance if she has appropriate coverage) if she needed one. In addition, Kolmnela's sons, who are 17 and 19 years old, appear to be mature enough to be in a position to assist their mother if that were necessary, even though it might require adjustments to their respective educational or career plans.

Accordingly, while Kolmnela's early release might make it more convenient for his family to cope with his wife's circumstances, that does not mean that they are completely unable to do so in his absence. As Chief Judge Colleen McMahon recently stated, although courts in this Circuit have "been freed by *Brooker* to consider the myriad of family circumstances that might warrant granting compassionate release, § 3582(c)(1)(A)(i) still only authorizes release where the family circumstances are truly 'extraordinary and compelling,' and not merely the inevitable circumstances families face when a family member is incarcerated." *United States* v. *John*, No. 15 Cr. 208 (CM), 2020 WL 6581217, at *2 (S.D.N.Y. Nov. 10, 2020). Courts have found that a defendant's alleged family circumstances were not sufficiently "extraordinary and compelling" reasons for a defendant's early release from prison in cases where the defendant's release was not absolutely necessary to care for the ailing family member because of the availability of alternative caretakers. *See, e.g.*, *United States* v. *Yoda*, No. 15 Cr. 95 (AJN), 2020 WL 5502325, at *3 (S.D.N.Y. Sept. 11, 2020) (holding that "the Defendant has not proven the existence of an extraordinary and compelling reason that warrants compassionate release" based on his father's inability to care for himself where "the Defendant does not allege in his motion that he is, or would be, the only available caregiver" for his father). Because Kolmnela has not alleged, let alone shown, that his family has no alternative means of coping with his wife's circumstances in his absence, they are not sufficiently "extraordinary and compelling" to justify his early release from prison.

In any event, because Kolmnela will be taken into the custody of the Department of Homeland Security's Immigration and Customs and Enforcement ("ICE") division for deportation

proceedings upon his release from BOP custody, the relief that his motion seeks will not necessarily alleviate his alleged concerns about COVID-19 or his wife's circumstances. Kolmnela is a citizen of Albania. As the Court noted at Kolmnela's sentencing, Kolmnela will likely be deported following the completion of his prison sentence in this case in light of the nature of his narcotics conviction. The Government has been informed by ICE officials that ICE has lodged a detainer with the BOP for Kolmnela that would result in Kolmnela being taken into ICE custody upon his release from BOP custody in connection with anticipated deportation proceedings. ICE officials have further reported that many CI Moshannon Valley inmates taken into ICE custody are detained at Clinton County Correctional Facility in Pennsylvania until the completion of their respective deportation proceedings. Accordingly, even if Kolmnela's motion for compassionate release from prison were granted, that does not necessarily mean he would end up being housed somewhere where is safer from potential COVID-19 exposure than CI Moshannon Valley, or that he would be able to live with his family to care for his wife.

2. **Kolmnela's Early Release Should Be Denied Based on the Section 3553(a) Factors**

Even if Kolmnela's motion adequately established "extraordinary and compelling reasons" allowing the Court to reduce his sentence — which is not the case — that does not resolve his entitlement to a reduction in sentence. *See* 18 U.S.C. § 3582(c)(1)(A). The Court must also consider whether or not it is appropriate to release him from prison in light of the sentencing factors set forth in Section 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A). The answer is "no." The ten-year prison sentence that this Court imposed for Kolmnela's role, as a leader of an international drug trafficking organization, in organizing massive shipments of 30 kilograms of methamphetamine and 114 kilograms of cocaine was and remains just.

Kolmnela's drug trafficking conduct across was and remains disturbing. He participated in separate endeavors to transport copious amounts of cocaine and methamphetamine worth millions of dollars for sale and, implicitly, eventual consumption by drug users. Both are extremely dangerous drugs and Kolmnela was involved in their planned distribution in bulk. He plainly undertook these actions without regard for the tremendous harm that the drugs could cause, particularly when loosed into the community in such quantities. Moreover, the execution of the two schemes bespeaks a high degree of planning and care. Each of the schemes involved shipping narcotics internationally. The cocaine scheme involved the chartering of a vessel, the embedding of cocaine inside clothing, and the use by Kolmnela of multiple cellphones; the methamphetamine scheme involved the use of a hidden compartment to store the drugs. Nor did Kolmnela's conduct in connection with either offense constitute a mistake of youth — he was at least 45 years old during the charged conduct. Neither does either of Kolmnela's offenses appear to be a crime of economic desperation — the Probation Department reported that Kolmnela and his wife owned multiple businesses, real estate properties and assets. (*See* PSR at ¶ ¶50, 66-71). In short, Kolmnela's crimes created a risk of extreme harm to the community, were utterly needless, and reflected a high degree of planning and sophistication.

Under the circumstances a ten-year prison sentence was and remains appropriate and necessary to meet Section 3553(a)'s goals of ensuring that his sentence reflects the seriousness of his criminal conduct, promotes respect for the law, provides just punishment for his offense, and adequately deters him and others who might wish to emulate his crime in pursuit of illicit profits.

See 18 U.S.C. § 3553(a)(2)(A)-(B). Reducing Kolmnela's sentence to "time served" per his request, which would equate to a 46% reduction of his ten-year prison term, would undermine those sentencing goals, particularly given the flimsiness of the alleged circumstances that he cites as the purported bases for his early release.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that defendant Leom Kolmnela's motion for compassionate release should be denied.

    Respectfully submitted,

    AUDREY STRAUSS
    Acting United States Attorney

By:   __/s/_____
    Samson Enzer
    Assistant United States Attorney
    (212) 637-2342

cc: James Kousouros, Esq.