06/22/2021

To: Honorable Andrew L Carter Jr
    United States District Court Judge
    Southern District of New York
    Daniel Patrick Moynihan
    United States Courthouse
    500 Pearl St
    New York, NY 10007-1312

From: Leom Kolmnela
    Federal Correctional Facility
    Allenwood Low
    P.O. Box 1000
    White Deer, PA 17887

Re: Compassionate Release Motion

Case No: 18-Cr-554 (ALC)

Dear Honorable Judge Andrew Carter Jr,

I am enclosing a motion for reconsideration of a denied compassionate release motion. The initial motion was filed by an attorney that was hired by my family, "James Kousouros". Since I can no longer afford the services of a private attorney, I am now filing this motion Pro Se, and am no longer represented by an Attorney in furtherance of the compassionate release motion. I previously filed this motion however according the the Pro Se clerk, it was left on front desk of this same Court, however it was never received by the proper clerk, even though I did certify the envelope. If you could please reconsider my denied compassionate release motion, and please send the decision to me, since I am representing myself.

Sincerely,

Leom Lolmnela

--------------------------------------------------------------------------------------------------------

FROM: 92398054
TO:
SUBJECT: CERTIFICATE
DATE: 06/24/2021 08:04:45 AM

CERTIFICATE OF SERVICE

I, Mr. Kolmnela, hereby certify that, a true and correct copy of the foregoing, has been served upon the person(s) below, via

U.S. Mail, postage prepaid, and addressed as follows:

United States Attorneys Office
Assistant United States Attorney
Mr. Samson Enzer
One Saint Andrews Plaza
New York, NY 10007

Dated 6-21-2021

RESPECTFULLY SUBMITTED,

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES
V.
LEOM KOLMNELA

MOTION FOR RECONSIDERATION OF THE COMOPASSIONATE RELEASE FOR NEW HEALTH ISSUES

CONTENT
_____

BACKROUND

JURISTICTION

DISCUSSION

1-MR. KOLMELA'S MEDICAL CONDITIONS (New evidence of Heart Health Issue's)
2-EXPLANATION OF MISSING IMPORTANT HEALTH RECORDS
3-MEDICAL REASON'S FOR EXTRAORDINARY AND COMPELLING CIRCUMSTANCES THAT WARRANT GRANTING THE MOTION
4-HARSH CONDITIONS AS RESULT OF COVID-19 LOCKDOWN
5-PRE-TRAIL HARSH CONDITIONS THAT WARRANT EXTRAORDINARY AND COMPELLING CIRCUMSTANCES
6-VACCINATION PROGRAM
7-LAW AND ANALYSIS
8-U.S.C. 3553(A) FACTORS THAT WARRANT GRANTING COMPASSIONATE RELEASE MOTION
9-MR. KOLMNELA HAS SERVED OVER 71% OF HIS SENTENCE
10-MR KOLMNELA'S GOOD CONDUCT WHILE IN PRISON
11-MR. KOLMNELA IS NOT A THREAT TO THE COMMUNITY, HIS LEADERSHIP AND WRITING EXPERIENCE MAKES HIM AN ASSET
12-EXHAUSTION REQUIREMENTS
13-MITIGATING CIRCUMSTANCES
14-LEGAL STANDART
15-CONCLUSION

UNITED STATES OF AMERICA     :

                       :

V.                        :           CASE NUMBER: 15 CR. 554 (ALC)

                       :

LEOM KOLMNELA          :

                       :

APPELLANT LEOM KOLMNELA'S MOTION
FOR RECONSIDERATION UNDER FEDERAL
CIVIL RUKES OF PROCEDURE, RULE 59(e);
BASED UPON DENIAL OF MOTION PERTAINING
TO COMPASSIONATE RELEASE

## MOTION FOR RECONSIDERATION OF THE COMPASSIONATE RELEASE FOR NEW HEALTH ISSUES

Dear, Honorable Judge Carter

The movant, Mr. Kolmnela, acting in the quality of Pro Se, respectfully requests for the reconsideration of his denied compassionate release, for the following, new, now known health reasons.

### BACKGROUND

Mr. Kolmnela was convicted on November 2019 on one count for exporting 500 Grams or more of Methamphetamine from the United States. He was sentenced to 10 years (120 Months) imprisonment followed by 5 years of supervised release. Mr. Kolmnela's home detention eligibility date is (06-26-2023) and his release date from prison, if not eligible for home detention, is (12-26-2003), (See; Sentence Monitoring Computation Data "Exhibit 1") Mr Kolmnela has two and half years still to serve on the sentence that was imposed on him.

### JURISDICTION

Pursuant to 18 U.S.C. 3582(c)(1)(A), a District Court may "reduce the term of imprisonment" where (1) "extraordinary and compelling reasons warrant such a reduction, (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission, "and (3) the reduction is supported by the factors set forth in supported 3553(a). See 18 U.S.C.3582 (c)(1)(A). The Second Circuit recently held that nothing in "the (2020 US, Dist. LEXIS4) now-outdated version of Guideline 1B1,13 limits the district court's discretion" to grant or deny a motion for a sentence reduction. United States V. Brooker, 976 F, 3d 228 237 (2d Cir. 2020). Rather, the First Step Act "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."Id. at 237."The only statutory limit on what a Court may consider to be extraordinary and compelling is that rehabilitation..alone shall not be considered extraordinary and compelling reasons." Id. at 238(quoting 28U.S.C. 994(t)(emphasis in Brooker))).

### DISCUSSION

### 1. MR. KOLMNELA'S MEDICAL CONDITIONS ( New Evidence of Heart Health Issue's)

Mr. Kolmnela comes for reconsideration of his denied compassionate release motion after he had discovered that he has "Heart Infarct" on December 11, 2020. Around the end of November until December 11, 2020, COVID-19 was wildly spreading around Moshannon Valley Correctional Facility. The virus entered Moshannon Valley by a Bureau of Prison's employee that was infected with COVID-19. In the unit C-2 of Moshannon Valley, were Mr. Kolmnela was housed with 72 others, everybody in that unit felt sick with various COVID-19 symptoms. Mr. Kolmnela was one of those people. During that time, nearly half of the unit was taken for emergency care because of their symptoms. There was no escape from COVID. Mr. Kolmnela, allthough didn't want to bother the authorities while he was sick, felt very sick for several days with high fever, cough, and other COVID related symptoms. Around the first week of December, Mr. Kolmnela experienced chest pain, and also experienced upper respiratory symptoms. On night of December 10th 2020, Mr. Kolmnela woke up several times from chest pains. On the morning of December 11, 2020 around 7:00am, he explained to the nurse that gives medication in the unit that he was experiencing very

severe chest pains, and trouble breathing. The nurse told him to go to the medical unit immediately. See "Exhibit-2" is the document from the medical department that shows he was seen there on a emergency basis, for chest pain and upper respiratory symptoms.

Mr. Kolmnela was checked by BOP doctors and was then given a EKG test for his heart. At that moment it was not mentioned to Mr. Kolmnela by the doctors that he had gone through Heart Infarct, neither they told him later at some point. "See Exhibit-3". It should be noted that back in May, 2020, Mr. Kolmnela had an EKG, and it was normal, his heart was in perfect condition. "See "Exhibit-4". The medical staff knew that this condition could be from a positive COVID infection so Mr. Kolmnela was tested for COVID-19 and then placed in medical isolation for 5 days. It was suggested that he take Tylenol and aspirin. During the quarantine, Mr. Kolmnela still felt chest pains and breathing problems on and off during that time. Mr. Kolmnela is not the type of person to "complain" at every single medical problem. He does not like to bother people, and just "tough" it out, but if he would have known about the Heart Infarct" he would have summoned medical help. Besides Mr. Kolmnela heart infract, in the same days, he suffered from a severe strep infection that the doctors said was that severe that lowered his immune system, and thus that's why COVID-19 hit Mr. Kolmnela even harder.

NOTE-1)Even in the day of test for Covid-19 Mr. Kolmnela shows negative, it is proven by CDC and Doctors in US and worldwide, that if Covid-19 enters in a room full of people and stays there for weeks, and half of people in that room will test positive, also the other's are infected with COVID. Doctors told him, he had Covid, but most probably he has past a day or two Covid infection, and that's why showed negative.

NOTE-2) Mr Kolmnela is ready to swear under perjury that the last week of November and first week of December 2020, he felt all the Covid-19 symptoms and other people in the unit felt sick with the same symptoms and all who were tested were detected positive with the virus after conducting Covid-tests by BOP doctors in Moshannon valley Correctional facility. Also, Mr.Kolmnela is ready to take a medical test that shows the he have antibody levels from a recent COVID infection.

## 2. EXPLANATION OF MISSING IMPORTANT HEALTH RECORDS
During the afore mentioned time period, Mr. Kolmnela hired a attorney to file the first compassionate release motion after he exhausted his administrative remedies with the warden at Moshannon Valley as required. On those days, Mr. Kolmnela did not mention his Heart Infarct because the doctors did not mention it to him . On December 20, 2020, Mr. Kolmnela filed a cop-out to obtain a copy of his medical records. The copy was given one month later on January 20, 2021, "See Exhibit-5". Even then Mr. Kolmnela was not told that he had Heart Infarct. Nor have the medical staff suggested for follow up on his heart condition with a outside heart doctor. Mr. Kolmnela felt chest pain on and off during the month of January. He felt dizziness and had spells of light headiness during this time. Mr. Kolmnela is still, at these times, suffering from the after affects of COVID infection and heart problems. In March while reviewing the medical records, Mr. Kolmnela came across the copy of the two EKG's, he sees the difference between the two, was worried, and sent them to his wife. She gave them to a heart specialist doctor to look at them. The doctor (heart specialist) said the EKG is very bad and puts him in danger especially if he gets Covid again, see "Exhibit-6". Mr. Kolmnela ask for heart specialist at Moshannon Valley, but they said was not serving sending defendant's out because the prison was closing. Than Mr. Kolmnela was in transit to an other prison, and insolated there in quarantine for nearly one month. While there he sent a cop-out to FCI Allenwood to follow up on his heart problem, but has not had any follow-up as per this date, see "Exhibit-7".

NOTE-1
After experiencing, on and off, respiratory difficulties, chest pain, abrupt sweats, and fast heart beats, for six months since he had Covid, and as cause of it, his heart infract, and not been attended even after requesting check-up; Mr. Kolmnela have walked through self-emergency on June 10-2021, after having experiencing several night's with fast heart beats, chest pain, and abrupt sweats. Mr Kolmnela has finally been attended by BOP doctors. He is now on process of blood analysis etc., that still require time to define what is going on with his health.
Although Mr. Kolmnela is extremely grateful for the medical staff here at Allenwood Low, he still has chest pains, a fast heartbeat, trouble breathing, loosing balance, and abrupt sweats. Also the new Covid-19 variant (Delta) that started in India and comes through Europe and is now rapidly consuming the United States, puts Mr. Kolmnela at risk of serious illness, or death and Allenwood Low does not possess the medical infrastructure to adequately provide protection or medical care for any inmates or staff when new Covid outbreak comes. Specially, Mr. Kolmnela is at greater risk due to his underlying heart condition, as it is proven that the Covid mess already with his heart when he contracted Covid on December 2020. (Cases of Delta version have been reported in every almost in every state, including Central Pennsylvania (PA), where the Allenwood complex is located). (See CDC.COVID19.GOV)

## 3. MEDICAL REASON'S FOR EXTRAORDINARY AND COMPELLING CIRCUMSTANCES THAT WARRANT GRANTING THE MOTION
On 5-11-2020, Mr. Kolmnela had a EKG and it was normal, see "Exhibit 4". This was 5 months before he caught COVID. His heart was in very good condition. Once Mr. Kolmnela contracted COVID in December 2020, and was seen on a emergency basis for chest pain, and the subsequent EKG completed on December 11, 2020, see "Exhibit 3", shows that his heart is damaged as a result of COVID-19 infection. This is a very dangerous heart condition that if were to get infected with COVID-19 again could kill him, or, minimum, have a long life of suffering from complications.

## 4. HARSH CONDITIONS AS A RESULT OF COVID-19 LOCKDOWN

On April 1, 2020, the BOP implemented a strict nationwide 14 day lockdown that severely affected Mr. Kolmnela's daily prison life, since Mr. Kolmnela has just arrived in (MVFC) from harsh conditions in MCC-NY, MDC-NY, and MDC-PHI. This lockdown which was only suppose to last for 14 days has been in place for almost 14 months, and there is no end in sight. Daily activities such as exercise, programming and vocational training have been severely limited. Access to religious services, medical care, and psychology services has been delayed due to the onerous lockdowns. The harsh conditions that Mr. Kolmnela has had to endure are akin to serving a double sentence. The daily stress of these lockdowns has taken a toll of Mr. Kolmnela's physical health as well as mental. Mr. Kolmnela has had to endure months, and years, without access to sunlight and fresh air. The unit that the defendant was in at Moshannon Valley was small and extremely dirty. The air quality was horrid, and putrid. This lack of sunlight and fresh, clean air lowered Mr. Kolmnela's immune system so that when he was infected with COVID-19 in December 2020, his reaction to the virus was much worse then if he were not living in harsh conditions during all his time in prison.

In United States v. Andy Ciprian, case # 11-CR-1032-74,(S.D.N.Y) the court stated, " The same logic applies here. A day spent in prison under extreme lockdown and in fear of contracting a deadly virus extracts a price on a prisoner beyond that imposed by an ordinary day in prison. While not intended as punishment, incarceration in such conditions is, unavoidable, more punishing. See e.g United States v. Rodriquez, No 00 CR 761 (JSR), 2020 U.S Dist LEXIS 181004, 2020 WL 5810161, at *3 (S.D.N.Y Sept 30 2020) ("The pandemic aside from posing a threat to a defendant's health had made a defendant's incarceration harsher and more punitive than would otherwise have been the case". In United States v. Jeffrey Correa, 08-CR-1026 (VEC) (S.D.N.Y) the defendant was convicted of an extremely heinous crime and was sentenced to a mandatory minimum of 15 years in prison. The judge stated, when granting Mr. Correa's motion, " The court believes that the extremely harsh conditions of confinement to which Mr. Correa has been subjected to over the past 9 months renders a minimal reduction below, that mandatory minimum warranted."

## 5. PRE-TRIAL HARSH CONDITIONS THAT WARRANT EXTRAORDINARY AND COMPELLING CIRCUMSTANCES

The 72 months that Mr. Kolmnela has served in prison, 52 months of that has been served in pre-trial detention between MCC Manhattan, and MDC Brooklyn. The conditions in those 2 prisons are very harsh as the court is aware of. As a result of the harshness, many judges at sentencing consider those harsh conditions, and give a lesser sentence. In MCC Manhattan, Mr. Kolmnela was entitled to breath fresh air for only "one and half hour" every 3 days, which is just "30 minutes" per day. However many times because of severe weather, a lockdown, or a institutional emergency, Mr. Kolmnela did not get neither that "half hour a day" fresh air. Mr. Kolmnela has essentially served 72 months in near-total-lockdown. In United States v. Hatcher, S.D.N.Y, 2021, WL 1535310, 18- CR- 454-10 (KPF), (Ms. Hatcher was at MCC Manhattan). The court noted that it had previously "found that harsh conditions of imprisonment occasioned by the COVID-19 pandemic are not, without more, sufficiently "extraordinary and compelling" to warrant compassionate release." However the court noted that it's ruling on that were "issued in the fourth, rather than the thirteenth month of the COVID-19 pandemic. Moreover, it is also true that courts reviewing motions for sentence modifications have considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences "harsher and more punitive" than would otherwise have been the case." See e.g. United States v. Rodriguez No 00-CR-761, 2020 U.S Dist LEXIS 181004, 2020 W.L 5610161 at *3 (S.D.N.Y, Sept 30, 2020), "The risk of suffering severe health consequences if the defendant contracts COVID-19, coupled to the severe conditions imposed by the concomitant lockdowns, and restrictions, that are necessary to ensure defendants safety, means that the actual severity of defendants sentence as a result of the COVID-19 outbreak exceed what the court anticipated at the time of sentence."

Over 72 months of Mr. Kolmnela's sentence has been served under harsh conditions. This extensive period of lockdown intensified by the pandemic has produced persistent trauma and intense mental strain on him and his family that will last a lifetime. The harsh conditions that Mr. Kolmnela has been (and is still) under were not the intention of the Court when he was sentenced.

Also: (Quoting United States v. Mel No TDC 18-0571 2020 Us Dist. LEXIS 74491, 2020 WL 2041674 at *3 (D. MD Apr-28-2020). In Us vs. Hatcher, S.D.N.Y, 2021 WL 1535310 18-Cr-454-10 (KPF) The Court indicated that it did not envision Ms. Hatcher to serve her term of imprisonment during a near-total-lockdown without mental health and other programs. Also, see e.g. United States v. Carty, 264 F.3d 191-97 (2nd Cir. 2001)(holding that pre-sentence confinement conditions may in appropriate cases be permissible basis for downward departure, "and vacating and remanding the defendant's sentence so that the District Court could reconsider the defendants request for a downward departure, and do so in the light of this holding "United States v. Sanpedro 353F. AppX482 486 (2nd Cir. 2009)("In imposing the sentence it did, the District Court considered, among other factors, the harsh conditions of the defendant's confinement at Combita, "in Columbia where he was detained before being extradited to the United States.

3.

## 6. VACCINATION PROGRAM

Mr. Kolmnela was offered the vaccine a few weeks ago. A few days before he was offered the vaccine, Mr. Kolmnela saw on Fox News, CNN News, and other News Channels, that the vaccine would cause blood clots. Mr. Kolmnela is afraid that he might be predisposed to blood clots as per his new heart infract. Due to this reason, Mr. Kolmnela declined to take the COVID-19 vaccine for his well founded fears of getting a blood clots. It has also been stated that the vaccine does not protect all persons, nor does it protect against the variants of the COVID-19 virus that are circulating throughout the United States. Most importantly, these strains/variants are now in Pennsylvania, for which Mr. Kolmnela has no immunity to, and these strains/variants, it said in News, are possibly even more deadlier then the one that Mr. Kolmnela had in his past infection. Yet if This Court suggests him to take the vaccine, he is willing to let aside his fears and to take the vaccine.

## 7) LAW AND ANALYSIS

While granting compassionate release for Mr. John Bass (defendant sentenced to life in prison without parole) (See United States v. Bass, 266 F, 3d 532, 2001 U.S. App, LEXIS 20888- 6th Cir, Mich, Sept. 25 2001) the Court concluded: Effectively, through 18 U.S.C. 3583(c), congress placed the sentencing Judge in the shoes of the now defunct Parole Commission. Today, compassionate release is widely understood as a means of protecting defendants from suffering harm due to unforeseen changed circumstances during their sentence. See U.S. Dep't of Just. Fed. Bureau of Prisons, Program Statement 5050,50: Compassionate release/ Reduction in Sentence, at & 571.60 (2015)("The bureau uses 18 U.S.C. 4205(g) and 18 U.S.C. 3582 (c)(1)(A) in particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing.") See also William W. Berry III, Extraordinary and Compelling: A Re-examination of the Justifications for Compassionate Release, 68 Md. L. Rev. 850, 860-61 (2009) (explaining that approach "keeps the sentencing power in the judiciary where it belongs, yet permits later review of sentences in particularly compelling situations'" (citing:(2021 U.S. Dist.

LEXIS 6): Crim. Div,. U.S. Dep'T of Just. Prosecutors handbook on Sentencing Guidelines and Other Provisions of the Sentencing Reform Act of 1984, at 121 (1987))). This is more true than ever now, in light of the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat, 5194, the spread of Covid-19, and the emerging consensus among the Courts of Appeals that "district courts need not consider (U.S.S.G & 1B1.13) when ruling on (defendant-filed compassionate release motions. "United States v. Elias, 984 F, 3d 516, 519 (6th Cir 2021). In practice, this system works better than State and Federal Parole Boards, because rather than being placed at the mercy of the decentralized body of arbiters, defendants are instead evaluated by the same judicial officer that has seen their case from arraignments, to trial, to sentencing: The Judge.C.F. The Parole Consideration, Process. Mich-Dep'T of corrections. https://michigan.gov/corrections/0,455,7-119-1435_11601-22909--,00htmL

(https://perma.cc/VG5Z-J65C) (last visited February 7,2021)("Decisions for Michigan prisoners serving life sentence are made by majority vote of all ten members of the Parole Board,")
Fulwood, supra, at 1. This transfer of release power also fulfills Congress's intention that sentencing not "be imposed in a mechanistic fashion, "but rather (2021 U.S. Dist. LEXIS 7) that the judge "consider all the relevant factors in a case(,)...impose a sentence outside the guidelines in an appropriate case, "and "thoughtful(ly) impos(e)" an "individualized sentence. "S. Rep. No, 98-225, at 53(1983).
Courts have "wide latitude" to exercise discretion in determining extraordinary and compassionate reasons to grant compassionate release. United States v. Morris, No. 20-1669, 2020 U.S. App. LEXIS 29874, at *5 (6th Cir, Sep. 17, 2020): see Elias, 984 F. 3d at 519; see also United States v. Kincaid, 805 F. App'x 394, 395 (6th Cir. 2020)("District courts have broad discretion to determine what sentences will serve &3553(a)' statutory objectives. "'(alteration in original)(quoting United States v. Kontrol, 554 F. 3d 1089, 1093 (6th Cir 2009))). Rightfully so, as the sentencing judge is often the only judicial officer who has seen a defendant's case from beginning to end. See Jones, 980 F.3d at 1114 (referencing "the common scenario" where 'the district judge who sentenced the defendant is the same judge who considers the defendant's reduction-of-sentence motion'" (quoting United States v. Keefer, 832 Fed. App'x 359,363 (6th Cir.2020))).

At least seven different Assistant U.S. Attorneys have been assigned to Bass's case through its pre-trial, trial, post-convictions, compassionate release, and appellate stages. Likewise, all but one of Bass's five trial, post-conviction, and compassionate release attorneys are different from one another. Thus Court stands alone with the institutional memory (2021 U.S. Dist. LEXIS 8) of John Bass, not just as a case, but as a person.

This court presided over Bass's three-week trial, during which witness after witness recounted his horrifying crimes. This Court sentenced Bass to two concurrent life terms upon the jury's verdict. This Court denied Basse's request for relief under 28 U.S.C. &225. This Court, considering the severity of Bass's crimes, believed even at the compassionate release hearing that he had "earned" his original sentence. (ECF No. 1134. PageID. 1323)("So, again, so now I qualify as a trial Judge to repeat myself a third time. Mr. Bass earned his original sentence,"). And this Court, using its unique perspective, carefully evaluated and ultimately decided that Bass had presented extraordinary and compelling reasons to be released. In doing so, it honored the weight of what Congressional intent and statutory interpretation in sentencing-from the Sentence reform Act through United

States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)-has bended toward: building a system that empowers judges to treat people like people. See United States v. Weakley, No. 20-5070,2020 U. S. App. LEXIS 26814, at *3 (6th Cir. Aug. 21, 2020) ("District courts have an obligation 'to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime (2021 U.S. Dist. LEXIS 9) and the punishment to ensue.'" (quoting Pepper v. United States, 562 U.S. 476, 487, 131S Ct, 1229, 179 L. Ed. 2d 196 (2011))). As this Court often reminds the attorneys who appear before it in compassionate release hearings, its goal in proceeding through the &3553(a) analysis is to evaluate defendants, not as they were at the time of their original sentencing, but as they are now. From a policy standpoint, looking to evidence of post-sentencing conduct incentivizes good behavior and disincentivizes bad behavior in prison. And ultimately, there is "no better evidence" when assessing the &3553(a) factors than the defendant's post-sentencing conduct. Pepper, 562 U. S, at491 (Melloy, J., concurring)(quoting United States v. McMannus, 496 F. 3d 846, 853 (8th Cir. 2007)). Indeed, the Supreme Court has recognized that evidence of "rehabilitation may...critically inform a sentencing judge's overarching duty under &3553(a) to 'impose a sentence sufficient, but not greater tan necessary' to comply with the sentencing purposes set forth in &3553(a)(2)." Id. (emphasis added). That what took place here.

The Court, after presiding over Bass's trial, sentencing him to life in prison, and denying his successive habeas petitions, was acutely aware of, and indeed, has spent years wrestling with, the depravity of Bass's crimes. It did not rehash every detail of those crimes because their severity (2021 U.S. Dist. LEXIS 10) was painfully clear from record. Instead, based on nearly twenty -three years of experience with John Bass, the Court affirmed its belief that his crimes were "horrific," but that on balance, the &3553(a) factors favored release. (ECF No. 1133, PageID.1277). The court remains unaware of any case law requiring it to acknowledge in writing the weight it attributes every single piece of evidence considered in its &3553(a).inquiry. In fact, the opposite is true. See United States v. Navarro, No. 20-5640, 2021 U.S. App. LEXIS 2409, at *6(6th Cir. Jan. 28, 2021)"(A) judge need not provide a lengthy explanation' for reducing a defendant's sentence' if the "contexts and the record" make clear that the judge had "a reasoned basis" for reducing the defendant's sentence."(quoting Chavez-Menza v. United States, 138 S. Ct. 1959, 1965, 201 L. Ed. 2d 359 (2018))).

. In the end of the conclusion, while granting compassionate release for Mr. Bass, the Court quotes: "Accordingly, while reviewing request for compassionate release, this Court has attempted to bring humanity to the process by reducing a hearing for every motion and evaluating petitioners as they are, not only as they were.

Just as the Bass case, this Court, and Your Honor, have now known Mr. Kolmnela and his background for 72 months. The court knows that the crime that Mr. Kolmnela committed is extremely serious, and he deserved the sentence that this Court ordered him to serve at that time. However very serious circumstance's have changed. When reviewing Mr. Kolmnela's record during his 72 months in prison, his excellent behavior and being a model inmate shows this court that he is a different person. When combined with his bad health, his post incarceration rehabilitation, and his wife's health issues, those are the factors that the Court looks for in a defendant when considering him for compassionate release. Further, this Court, just as the Bass's Court did, has had a chance to know Mr. Kolmnela during the past 6 years. The court knows that his family has appeared in this Court on several occasions, showing the Court that Mr. Kolmnela cares very much about his family, and his family cares deeply for him. Mr. Kolmnela let his family down when committing these crimes and now is devoted for the rest of his life to make it up to him, and to society. Society has been severely impacted by the crimes committed by Mr. Kolmnela. This Court also has read Mr. Kolmnela's letters that he wrote to this court the day of sentencing and also at the time he asked for compassionate release. The Court also has received letters from his wife and children, and letters from the community that were submitted to this court for sentencing and for compassionate release. These letters describe his character as a caring and a good human being. The court also received letters from his fellow prisoners, were the people that know him personally in prison and have shared their difficult days with him, have described him as helping them change their lives. Those letters show how the presence of Mr. Kolmnela in their lives, has changed their way of thinking regarding God, their criminal thinking, and how Mr. Kolmnela gives them guidance on how to be a better persons in life, by teaching them his mistakes and how he rectified them. Now that the court has known Mr. Kolmnela for 72 months, the court, by the record, can see the difference he has made since he commit his crime. These facts show that Mr. Kolmnela is not now that person that was 6 years ago.

## 8) U.S.C 3553(A) FACTORS THAT WARRANT GRANTING THE COMPASSIONATE RELEASE MOTION

The 72 months that Mr. Kolmnela has done in prison has been more harsh and far more punitive then what 72 months should be in Federal Prison. In this case, it justifies for the reduction of 30 months that Mr. Kolmnela has left to serve. Mr. Kolmnela's Heart Infarct caused by COVID-19 and the 72 months that he has been forced to live in lockdown or modified lockdown conditions warrant immediate release. When Your Honor sentence Mr. Kolmnela, rightfully, to the mandatory minimum sentence of 120 months, Your Honor could not have envisioned that COVID would hit Mr. Kolmnela to the point that it almost killed him and caused his Heart Infarct. ( Heart infract it is a very dangerous condition and will be with Mr. Kolmnela for the rest of his life. Thus Mr. Kolmnela's health and life will never be the same, as it was before he was sentenced).

In United States vs. Andy Ciprian, Case Number 11-CR-1032-74 (S.D.N.Y), the court states "The principal bases on which the Court originally determined that the mandatory 120 month sentence imposed was reasonable were to ensure that Ciprian's sentence reflected the seriousness of his offense and the need to promote respect for the law, general and specific deterrence and the protection of the public. Those factors remain as weighty as at the time of sentencing. But Ciprian's term in custody has proven more arduous than the Court could have anticipated in 2014. Also stated "The same logic applies here. "A day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on the prisoner beyond that imposed by an ordinary day in prison". While not intended as punishment, incarceration in such conditions is, unavoidably, more punishing". Also stated in the compassionate release motion for Ciprian's early release is also compatible with the U.S.C 3553(a) interest in personal and specific deterrence and the protection of the public. The eight years that Ciprian has served in federal custody, including under Harsh Conditions of the last 10 months, should suffice to deter him and give pause to other's who might emulate his conduct." See e.g Mcrae, 2021 U.S Dist LEXIS 8777, 2021 WL 142277 at *5 (granting compassionate release in part because of medical conditions took on additional weight in U.S.C 3553(a) analysis, See also United States v. Wilson 16Cr 317 (PAE), Dkt 656 at 4-7, 2020 U.S Dist LEXIS 157533 (finding these U.S.C 3553(a) factors to favor release of defendant with medical condition subjecting him to heightened risks of COVID-19.

In the Mr. Ciprian's case the court went below the mandatory minimum, when Mr.Ciprian had served 8 years of his sentence at that point, and Mr. Kolmnela in this case have served 6 years, yet the enduring time of Covid that Mr. Kolmnela is still living is longer than Mr. Ciprian's. The harsh conditions that Mr.Kolmnela lived during his six years of sentence is harsher than the time that Mr.Cirprian has served during his sentence. Also Mr.Kolmnela developed his dangerous heart condition, all while serving his sentence under harsh conditions. The harsh conditions Mr. Kolmnela has had to endure surely debilitated his heart, so that when he contracted Covid, this infection easily damaged his heart. All these differences between Mr. Ciprian's and Mr. Kolmnela's case, can suggest, that even if this Court goes below mandatory minimum in Mr. Kolmnela's case, more than what the Court did in Mr.Ciprian's case, this will be adequate to address the harsher conditions that Mr. Kolmnela has been going through serving his 6 years in prison.

In the United States Vs. Hatcher, S.D.N.Y, 2021 WL 1535310, 18 Cr. 454-10 (KPF) The court also noted that Ms. Hatcher's sentence would not undermine the 3553(a) factors. The court indicated that it did not envision Ms. Hatcher to serve her term of imprisonment during a near-lockdown without mental health and other support programs. The court also noted that Ms. Hatcher had served half her sentence and she has demonstrated good behavior and has taken advantage of programming and services offered before the pandemic.
Also in the Ms. Hatchers case; the court noted; it is also true that courts reviewing motions for sentence modification have considered the extent to which onerous-lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences "harsher and more punitive than would otherwise have been the case."

Also in the case of Mr. Correa. Court states: Further the Court believes that the extreme harsh confinement to which Mr. Correa has been subjected over the past nine months renders minimal reduction below mandatory minimum warranted and just. See, e.g, United States v. Rodriguez, No. 00-CR-761, 2020 U.S. Dist. Lexis 181004, 2020 WL 5810161, at *3(S.D.N.Y. Sept. 30, 2020) "The risk of suffering severe health consequences if defendant contracts Covid-19, coupled to the severe conditions imposed by the concomitant lockdowns and restrictions that are necessary to ensure defendants safety, means that "the actual severity of defendants sentence as result of Covid-19 outbreak exceeds what the Court anticipated. (2020 U.S. Dist. LEXIS 18) at the sentencing" (quoting United States Vs. Mel, No, TDC-18-0571, 2020 U.S Dist. LEXIS 74491, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020)))

In Ciprian's the Court quoted: "Beyond the risk to health, the pandemic has also subjected all inmates, and often especially those who contract the virus, to far more restrictive conditions of confinement, and has prompted limits on access to visitors, including family, far beyond what could have been expected at sentencing. In Ciprian's case the Court also stated: "Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent unusually arduous conditions merited recognition by courts in measuring the just sentence.

("The pandemic, aside from posing a threat to a defendant's health, has made a defendant's incarceration harsher and more punitive than would otherwise have been the case. This because the federal prisons, as prime candidates, for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration far harsher than normal.") See; United States vs. Salemo. No. 11Cr. 65 (JSR), 2020 U.S. Dist. LEXIS 86977, 2020 WL 2521555, at *3 (S.D.N.Y> May 17, 2020)

Here, in Mr. Kolmnela's case, applies perfectly these cases, as Mr. Kolmnela has spent well nearly fourteen months under harsh conditions in Covid restrictions. Mr. Kolmnela lived in fear of contracting the virus, and then he got sick by contracting the virus. Now he still lives in constant fear because of his heart problems that came from his COVID infection and is still experiencing chest pain from his heart problems, light headedness, and other "long term COVID symptoms". Mr. Kolmnela has served 6 years in prison, but if you combine them (all of them confined in harsh conditions during his confinement at MCC-NY, MDC-NY, MDC-PH, and Moshannon Valley) they are equal with the eight years that Ciprian has served.

In Ciprians compassionate Release the Court, when granting him compassionate release, quoted: "Last, at least two other & 3553(a) factors favor release more strongly today than they did at sentencing. The court under 3553(a)(1)and(2)(D) is to consider the "history and characteristics of the defendant" and "the need to provide the defendant with needed medical care" This factors take more weight given Ciprian's heightened vulnerability to covid-19, which, regardless of Ciprian's past, mild case of Covid-19, the Government concedes creates extraordinary and compelling circumstances. Gov't Mem. at 2-3.9.

Different from Ciprian's mild case of Covid-19, Mr. Kolmnelas infection with Covid hit him harder until to cause him heart infract and other respiratory infections that were treated with a high dosage of antibiotics (please see Mr. Kolmnela's Medical record for both heart infract and respiratory infections on December 2020). This itself creates extraordinary and compelling circumstances in Mr. Kolmnela's case, but an other important point is that Mr Kolmnela has not been provided with the medical care he needed as the 3553(a)(1)and (2)(D) suggests. Mr Kolmnela has not been medical care since he experienced the heart infract. While in custody and as showed on the tests of the emergency he went on December-11-2020, Mr. Kolmnela has not been conducted any extra blood test, or any kind of doctors. and less heart specialist's.

See also, e.g., Mcrae, 2021 U.S. Dist. LEXIS 8777, 2021 WL 142277, at *5 (granting compassionate release in part because medical conditions took "on additional weight" in &3553(a) analysis): See; Wilson, 16Cr.317 (PAE), Dkt 656 at 4-7, 2020 U.S. Dist. LEXIS 157533 (finding these &3553(a) factors to favor release of defendant with medical conditions subjecting him to heightened risks of severe COVID-); See, United States v. Davies, 469F. Supp. 3d 175, 179(2020)(same for elderly defendant where serious medical conditions took "on outside importance" in the &3553(a) analysis): United States V. Brown, 467F. Supp, 3d 209, 212-13(2020)(same).

9) MR. KOLMNELA HAS SERVED OVER 70% OF HIS EFECTIVE SENTENCE.

Mr. Kolmnela has served to this date over 71% of his effective sentence, which is way further than 50% that is recommended by congress based on the Cares Act.

See De La Cruz, 2020 U.S. Dist LEXIS 195944, 2020 WL 6193891, at *6 (citing United States V. Morales, No, 3:12-cr-164 (JBA), 2020 U.S. Dist. Lexis, 164016, 2020 WL 5369198 at^ (D.Conn. Sept, 8, 2020)(slip op) (granting compassionate release to a defendant who had served over half of his prison sentence.
Also See, e g., United States V. Mcrae, No. 17 Cr.643 (PAE), 2021 U.S. Dist. LEXIS 8777, 2021 WL142277, at *5 (S.D.N.Y. Jan. 15, 2021) (granting compassionate release to defendant with medical conditions, putting him at heightened risk of severe Covid-19 and who had served 75% of effective sentence. Also; Unites States v. Lizardi, No 11 Cr. 1032 (PAE), Dkt. 2532 at 1-2,9 2020 U.S. Dist. Lexis 188147 (S.D.N.Y. Oct. 9, 2020) same for defendant that had served 93 months of a 121-month sentence. See also United States Vs. Hatcher (granting compassionate release to defendant that had served half of the sentence).

10)MR. KOLMNELAS GOOD CONDUCT WHILE SERVING HIS SENTENCE.

During Mr. Kolmnela's 72 months in prison, he has never had a single disciplinary infraction. Mr. Kolmnela has been role model for other prisoners. He has dedicated his time to take all the courses available to him, including "Live By Example" (See. Exhibit 9) that is very well recognized by BOP and Courts. Also he has given bible classes and other education classes to his fellow prisoners. Mr. Kolmnela has been an good example for the people around him and he's helped his fellow friends in prison to trust more in God, in Justice and to be better people for their future lives. (Please see the letters, directed to the court by at least 12 different inmates where they express how Mr. Kolmnela's presence in their lives has impacted and changed dramatically their lives for good while in prison). (See Letters in exhibits submitted by Attorney Mr. Kousouros when file for compassionate release)

In Ciprian's case, the Government notes that Ciprian's disciplinary record in prison reflects two infractions, both in 2019, for possessing a "hazardous tool" Gov'n Mem, at 4. Those concerning incidents weigh against Ciprian's early release. On balance, however, those infractions, which did not involve violence, do not outweigh the factors favoring the modest expedition of Ciprian's release date.

In Mr. Kolmnela's case, Mr. Kolmnela has no infractions of any kind, and this shows that he is a model inmate, and person. In addition, Mr. Kolmnela was scored under the Bureau of Prison's Pattern score as a minimum.(See exhibit 8) The PATTERN score is used to show the likelihood that a inmate will commit another crime once released. Mr. Kolmnela shows a very low chance of recidivism, and this should also be greatly weighed in his favor when granting release.

See also United States Vs. Pena. Court also recognizes that the nature of the underlying offense, involving a large-scale drug conspiracy of which Mr. Pena was part, is undoubtedly serious. Because the "nature and circumstances" of Mr. Pena's crimes, particularly his crime of conviction, are "undoubtedly serious, this may weigh against granting compassionate release. Yet, in the Mr. Pena's, the court stated: "Other factors, however, weigh in favor of release, even if ever so slightly." On the record before the Court Mr. Pena has received no disciplinary tickets over his nearly four years in pretrial detention and federal custody.

Similar to Mr. Pena's case, In Mr. Kolmnela's case, the crime he committed is also undoubtedly serious, and might weigh against his compassionate release, but many other factors weigh in favor to release him.

## 11- KOLMNELA IS NOT A THREAT TO THE COMMUNITY, HIS LEADERSHIP AND WRITING EXPIRENCE MAKES HIM AN ASSET

Mr. Kolmnela is now over 52 years of age. Mr. Kolmnela knows that the crimes he committed were very serious and how those endangered the community. Mr. Kolmnela is a different person as the record shows. (Exhibit 8) He is older then when he committed his illegal activity. His past mentality has changed and is replaced now with that of different person, changed for good. He now feels the pain and hurt he caused not only to his community, but to his family, and the world. He thinks of his two young son's all the time, and understands now better than ever before, the suffering that he caused to the many communities, and families of the end user of the drugs he help sell. He have promises to God he will never pose danger to the community again. He will never commit any crime or wrong doing. Mr. Kolmnela is man that believe, now, in God more, since prison has greatly expanded his religious devotion. He will integrate himself into a person that will serve his community, and teach others not to go down the same path as him. Mr. Kolmnela has over 100 thousand followers on his social media networks that follow his writings. His plan now is to grow the number of his followers, and use those platforms to help his followers grow and prosper by teaching them lessons that will impact their lives for good, mentally and spiritually. Mr. Kolmnela is devoted to his family, and they suffered his long 72 months of imprisonment that he can only blame himself for making them endure. Mr. Kolmnela makes a promise to God, to his family, and now, again, to this court that he will never choose the wrong path again. He will never hurt his family, or society again.

## 12- EXHAUSTION REQUIRMENTS

Mr.Kolmnela has satisfied the pre-requisite for Compassionate Release. 18 USC 3582(c)(1)(A) permits such relief upon motion of defendant after the defendant has exhausted all administrative rights to appeal, or a failure of the Bureau of Prisons (BOP) to bring a motion on defendant's behalf or a lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility, whichever is earlier.Kolmnela made a request to the warden. On october, 26 ,2020, the Warden denied Mr. Kolmnela request (See Exh. Henceforth, the Exhaustion Requirement.is met.

## MEMORANDUM OF LAW

Mr. Kolmnela eligible for Compassionate Release under 18 USC 3582(c)(1)(A)(i) as amended by the First Step Act, and Criteria set forth in USSG 1B1.13.

## 13- MITIGATING CIRCUMSATANCES

America, this great country, is built on the foundation that: "All man under God, shall be treated equally". Yet, Mr. Kolmnela, like to explain to this court that when compared to a U.S Citizen defendant next to him, were both committed the same crime, each were sentenced to the same time (ten years mandatory minimum), and both have the same pattern score, with no disciplinary reports throughout their incarceration, the American defendant will go home sooner than Mr. Kolmnela because Mr. Kolmnela is not a US citizen. Mr. Kolmnela has been sentenced as though he were an U.S Citizen, but when it comes to the privilege's of an U.S Citizen defendant, (as home confinement, half way house, FSA programming that discount time of sentences, drug programing that discount one year off of sentences, and also the privilege's of serving his sentence in the range of 500 Miles close to his family) Mr. Kolmnela is excluded of all those privilege's that would have released him sooner, and this has caused him and his family to suffer more, punishing his family in certain way since they has not been able to see him for years now. To reiterate again, this is only because Mr. Kolmnela is not a U.S Citizen.

For example; Mr. Kolmnela and the U.S Citizen defendant, both, must serve 102 months of the 120 month sentence. Yet, the U.S Citizen however is entitled to up to a year off his sentence for completion of RDAP, 6-12 months of half-way house, also for First Step Act credits for certain approved programs that the 'American' defendant is allowed to take, but Mr. Kolmnela is not allow to complete because of his immigration status.
The difference is that the U.S Citizen defendant is privileged, because he would only have to serve around 72 total months, after all benefits of those programs are applied in a 120 Month sentence imposed by the Court. This is the same time that Mr. Kolmnela has served already. However the time the "U.S" citizens, Mr. Kolmnela is comparing himself with, had to endure during his prison sentence were not been spent in harsh conditions as Mr. Kolmnela did.

The Congress has given the power to Courts to determine what qualifies as extraordinary and compelling circumstances when granting compassionate release motions. Congress gave this power to the Court's because they know that there are unique situations that Congress could not have foreseen when the law passed. However what Congress did not address was the inequality that a defendant who is an immigrant is faced with when compared to a defendant who is a U.S Citizen. In Mr.. Kolmnela's unique and atypical situation, the issue's this Court should consider when deciding his motion are; his health, his wife's health, the harsh condition he has had to endure for 72 months so far, he contracted a very dangerous virus that resulted in a severe medical condition known as Heart Infract all while at the hands of BOP, and lastly, not being able to have the same privilege's that United States Criminal Defendant's are given. All of those factors and circumstances satisfy the"Extraordinary and Compelling" criteria of compassionate release and that should warrant the Court to grant this motion.

The Supreme Court has made clear that Judges might not reduce the sentence just because of home confinement issue, yet the Supreme Court has made it clear that if there are other factors to that are extraordinary and compelling circumstances, then the Judges can use those factors when giving compassionate release to non American citizens.

See; Koon, 518 U.S. at 106. rather, in order for a district court to base a departure on the fact that defendant, as deportable alien, is not eligible for early release, even if he completes the drug program, there must be additional facts concerning the defendant's individual circumstances to make the particular case atypical or unusual.
Related to home confinement equality concerns, between citizens and non citizens, the circuits that have considered this issue since Koon, have held that increased severity in the conditions of confinement, resulting from alien status is a possible basis for departure in some circumstances.

Also see United States Vs. Nolberto Lopez Salas; 266 F.3d 842;2001 U.S. App LEXIS 20481. U.S. Court Of Appeals for the Eighth Circuit, stated that: Increased severity in the conditions of confinement resulting from alien status is a possible basis for departure from sentencing guidelines in some circumstances. However, the fact that a deportable alien may be subject to some increase in the severity of of the conditions of confinement alone is not sufficient to make his case atypical or unusual. A departure on the basis of increased severity in the conditions of confinement resulting from alien status is only appropriate in exceptional circumstances, such as where there is a substantial, undeserved increase in the severity of conditions of confinement, which would affect substantial portion of a defendant's sentence.

Various Courts Of Appeals have held that home confinement and half way house are for the purpose to prepare the defendant for the release into the community. Also due the fact that the defendant is a "alien" makes him not entitled to none of the privileges of law, such the FSA and other programs, as half-way house and/or home confinement. All men are to be treated equally by law's also, same as in the punishment and the privilege's of law, and this means that Mr. Kolmnela should be treated just as equally as an American Defendant. Mr. Kolmnela, respectfully, asks this court to have this issues in consideration while making the decision for his compassionate release.

14-LEGAL STANDARD

In December 2018, the President signed the First Step Act into law. The Act was a momentous culmination of a bi-partisan effort to improve criminal justice outcomes, as well as "to reduce the size of the federal prison population while also creating mechanisms to maintain public safety. The statute amends numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration's.

Compassionate release, codefined in its amended form at 18 U.S.C 3582(c), provides the means for inmates to be released from prison early whenever "extraordinary and compelling reasons warrant such a reduction." Congress did not define "extraordinary and compelling circumstances." under 18 U.S.C 3582(c)(1)(A)(i): rather, it directed the U.S. Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."

In interpreting the meaning of "extraordinary and compelling reasons" some courts turned to the United States Sentencing Commission's policy statement for the BOP on compassionate release, adopted before the passage of the First Step Act. However, as the Seventh Circuit recently noted,

Section 1B1.13 addresses motions and determinations of the Director, not motions by prisoners. In other words, the Sentencing Commission has not yet issued a policy statement, "applicable" to (prisoner-initiated requests for compassionate release). And because the Guideline Manual lacks an applicable policy statement, the trailing paragraph of 3582(c)(1)(A) does not curtail a district judge's discretion. Any decision is 'consistent with' a nonexistent policy statement.'

Therefore, "district judges must operate under the statutory criteria," which provides that "only extraordinary and compelling reasons" justify the release of a prisoner who is outside the scope of 3582(c)(1)(A)(i)."

Neverless, the Seventh Circuit added that the "substantive aspects of the Sentencing Commission's analysis in 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling circumstances." The Application Notes provide four categories under which extraordinary and compelling circumstances might exist: (A) Medical Condition of the Defendant: (B) Age of the Defendant: (C) Family Circumstances and (D) Other Reasons. The first three of categories outline specific criteria that the defendant must meet. The fourth category, on the other hand, provides an open-ended catch all, which allows a court to use its discretion to assess whether 'there exists in the defendant's case an extraordinary and compelling reason other than...the reasons described in subdivisions (A) through (C)." Looking to the plain and ordinary meaning, an "extraordinary and compelling reason" is a reason that is beyond what is usual, customary, regular, or common" and pertains to an "irreparable harm or injustice." See Extraordinary, Black's Law Dictionary (11th ed 2019); Compelling Need. Black Law Dictionary (11th ed 2019).

This court is already aware of the medical conditions of Mr.. Kolmnla's wife; which fall in the (C) category, and now is more aware also about health conditions of Mr. Kolmnela, which fall in the (A) category of these provisions. Yet, even if this court feels that Mr. Kolmnela's wife medical conditions and Mr. Kolmnelas own health conditions are not severe enough to grant his compassionate release motion, then there is plenty of other factors and evidence that satisfy the factors for: Category (D) "Other Reasons"

All the reasons that have been stated in this motion make Mr. Kolmnela's case extraordinary and compelling. The increase in the severity of his sentence is equivalent to approximately two (2) days for every one (1) day spent in prison under extreme lockdown and harsh conditions during all six years of imprisonment. In Mr. Kolmnela's case, that would double the 72 months that he has served under extraordinary and compelling circumstances, totaling his time served to 12 years; way over the mandatory minimum that the courts intentions were when this court impose his sentence.

15-CONCLUSION

Combining (1) Mr. Kolmnela's heart infract as cause of contracting COVID-19. (2) His very harsh conditions living during almost 15 months of Covid time. (3) His harsh conditions living during his pre-trial. (4) The fact that Mr. Kolmnela hasn't any disciplinary faults during his 72 months of imprisonment. (5) The fact that Mr. Kolmnela has not been taken care of his heart health properly from prison authorities, that does not comply with (3553(a)(D): (To provide the defendant with needed educational or vocational training, MEDICAL CARE, or other correctional treatments in the most effective manner)(Since his heart infract on or around 12-11-2020 until 05-11-2021 Mr. Kolmnela has not been conducted any blood test, nor heart test, and less has been sent to a heart specialist) (The heart problems, as it is the "Infract", needs immediate attention, and Mr. Kolmnela hasn't had that attention needed), and (6) the fact that Mr. Kolmnela has served 70% of his sentence; (7) The fact that Mr. Kolmnela lives in fear of contracting COVID-19 again or any of the new strains/variants currently circulating. ( Due to his heart condition, if he catch COVID again, it could, quite possibly, be a death sentence for him.) All this points make Mr. Kolmnela's case "extraordinary and compelling". Also having extracted his new heart condition while serving the sentence imposed by this court, should make Mr. Kolmnela's case more "extraordinary and compelling" than if he had this heart condition before this court sentenced him.

Thus considering only his heart infract from Covid, and that Mr. Kolmnela has not been able to breath fresh air properly for 72 months, makes his punishment harsher than what this court meant at the time the court sentenced him. In U.S.C 3553(a) (A) (To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense). When considering the harshness that Mr. Kolmnela has had to endure through 72 months in lockdown's, the remaining 30 months that Mr. Kolmnela has left to serve, will be a kin to a 102 month he has to serve in total to satisfy the 120 months this court imposed as sentence.

Also, if granted compassionate release, Mr. Kolmnela, is willing to agree to immediate deportation to his country. Where his sick mother (that he has not seen for 20 years now) lives. The only thing that Mr. Kolmnela want is to be able to be free so he can take care of his heart and his health properly, and take care of his sick wife that has health issues as this Court knows from the first filings for compassionate release by, then, Mr. Kolmnela's attorney Mr. James Kousouros. It should also be noted the Mr. Kolmnela's home country, Albania, has a very low infection rate, and his chance of being reinfected will be drastically reduced by grating this motion and expediting deportation. (SEE EXHIBIT 10)

Many courts, when granting compassionate release motions were the defendant was sentenced to a mandatory minimum, went below the mandatory minimum sentence. If your Honor considers that Mr.Kolmnela should complete his full sentence of ten years in confinement, than this Court can consider releasing Mr.Kolmnela to home confinement. He still will be severely restricted in his movements, only for work/doctors appointments, and religious services. This will allow him to live without the harsh conditions that he has had to endured during this very long 6 years. By being placed on home confinement for the remainder of his sentence, that time will balance those harsh conditions he has been living in prisons. Also he will be able to take care of his health properly. Also, in home confinement, Mr. Kolmnela will live fully insolated and will have less possibility to extract Covid-19 again. His house on 22106 Hackney Street West Hills CA. 91304 where his wife and two sons reside, meets all the conditions for home confinement.
As this court is aware, and it has been mentioned with "case laws examples" that were in the compassionate release filed by Mr. Kolmnela's attorney for compassionate release Mr. James Kousouros, many courts has granted home confinement even to non US citizen defendants that have detainers by ICE, as do Mr. Kolmnela.

Finally, for all the facts presented in this motion, and most importantly for the new heart condition that Mr.Kolmnela is now inflicted with during his punishment, Mr. Kolmnela, respectfully, pleads to this court to consider all these facts, his conduct while in prison, and all other issues mentioned herein, when making the decision for the reconsideration of his compassionate release.

At this crucial moment for his life, Mr. Kolmnela respectfully asks this Court to see him as the person that he is today, and not as that person that he was 72 months ago, and grant immediate release to immediate deportation, or to home confinement.

RESPECTFULLY SUBMITTED,

Leom Kolmnela
Register Number: 92398-054
Federal Correctional Correctional
Allenwood Low
P.O. Box 1000
White Deer, PA 17887

EXHIBIT-1

```
REGNO..: 92398-054 NAME: KOLMNELA, LEOM
```

```
FBI NO...........: 657566VD0          DATE OF BIRTH: 03-14-1969  AGE:  52
ARS1.............: ALF/A-DES
UNIT.............: UNION               QUARTERS......: U08-492L
DETAINERS........: NO                  NOTIFICATIONS: NO
```

HOME DETENTION ELIGIBILITY DATE: 06-26-2023

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  12-26-2023 VIA GCT REL

---------------------CURRENT JUDGMENT/WARRANT NO: 010 ----------------------

```
COURT OF JURISDICTION...........: NEW YORK, SOUTHERN DISTRICT
DOCKET NUMBER...................: 18-CR-554 (ALC)
JUDGE...........................: CARTER
DATE SENTENCED/PROBATION IMPOSED: 11-06-2019
DATE COMMITTED..................: 02-10-2020
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO
```

```
                 FELONY ASSESS  MISDMNR ASSESS  FINES       COSTS
NON-COMMITTED.:  $100.00        $00.00          $00.00      $00.00
```

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO       AMOUNT:  $00.00

---------------------CURRENT OBLIGATION NO: 010 ----------------------
```
OFFENSE CODE....:  423     21:841,960 DRUG-METH,FSA        FSA INELIGIBLE
OFF/CHG: 21:953(C), 960(A) 960(B)(1)(H) AND 18:2 EXPORTING
         METHAMPHETAMINE FROM THE UNITED STATES (COUNT 1)
```

```
SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:  120 MONTHS
TERM OF SUPERVISION............:    5 YEARS
DATE OF OFFENSE................: 06-19-2015
```

G0002      MORE PAGES TO FOLLOW . . .

REGNO..: 92398-054 NAME: KOLMNELA, LEOM                    EXHIBIT — 1

------------------------CURRENT COMPUTATION NO: 010 ------------------------

COMPUTATION 010 WAS LAST UPDATED ON 01-10-2020 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 02-21-2020 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010

```
DATE COMPUTATION BEGAN..........: 11-06-2019
TOTAL TERM IN EFFECT...........:    120 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:     10 YEARS
EARLIEST DATE OF OFFENSE........: 06-19-2015

JAIL CREDIT....................:      FROM DATE      THRU DATE
                                     06-19-2015     11-05-2019

TOTAL PRIOR CREDIT TIME.........: 1601
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 540
TOTAL GCT EARNED................: 270
STATUTORY RELEASE DATE PROJECTED: 12-26-2023
ELDERLY OFFENDER TWO THIRDS DATE: 02-17-2022
EXPIRATION FULL TERM DATE.......: 06-18-2025
TIME SERVED....................:      5 YEARS      10 MONTHS      10 DAYS
PERCENTAGE OF FULL TERM SERVED..: 58.6
PERCENT OF STATUTORY TERM SERVED: 68.7

PROJECTED SATISFACTION DATE.....: 12-26-2023
PROJECTED SATISFACTION METHOD...: GCT REL
```

G0000        TRANSACTION SUCCESSFULLY COMPLETED

*EXHIBIT-2*

92398-054
KOLMNELA, LEOM
DOB: 03-14-1969
ARSD; 02-10-2020 MVCF

*NKDA*

**R RESPIRATORY: RULE OUT CORONAVIRUS**

DOB: _____ ID Number: _____ Facility Name: _____

| SUBJECTIVE: Chief Complaint: ~~Chest pain /upper respiratory Symptoms~~ |
|---|

*POINT 2 C*

| Sick Call | Routine | Urgent | Walk-In | ~~Self-Declared Emergency~~ | True Emergency |
|---|---|---|---|---|---|

→ *POINT 1*

Date/Time/Activity at onset: 12/3/20

Allergies: NKDA

Precipitating factors: Date I/D/R admitted to facility: 2/01 20

Has I/D/R been exposed to anyone with COVID-19 or Flu symptoms? (Who, What, When): H/s unit

Has I/D/R been off-site recently (when, where): no

Has I/D/R had any of the following symptoms (circle applicable): Fever (Chills) Repeated Shaking Chills (Cough)
Shortness of Breath    Muscle Pain    Headache    (Sore Throat)    New Loss of Taste or Smell    no

Has the I/D/R had any of the following (circle applicable): Trouble Breathing    Persistent Chest Pain    New Confusion or
Inability to Arouse    Bluish Lips or Face    no

Current medications (OTC and Rx): See MAR

Age 65 years or older: No    History of HTN: no    Heart disease: No    Diabetes: no

Other chronic illness: no    Recent respiratory infection: no

**OBJECTIVE** BP: 120/100 P: 100 R: 18 T 97.5 (> than 100.4 refer to provider) Weight: 185 O2 Sat: 96

| Weakness: | Fatigue: no |
|---|---|
| Cough: ___Yes ___No | Productive: ___Yes ___No |

Respiratory rhythm: ___even ___uneven ___unlabored ___labored — shallow ___normal ___deep

Shortness of Breath: no    Retractions/Accessory muscle use: no

Right Lung Sounds (describe severity): ___Clear ✓ ___Wheezes ___Ronchi ___Rales ___Diminished

Left Lung Sounds (describe severity): ___Clear ✓ ___Wheezes ___Ronchi ___Rales ___Diminished

Skin: ✓ Normal (warm/pink/dry) ___Pale ___Flushed ___Cyanotic ___Mottled ___Diaphoretic ___Cool
___Dusky

Swollen glands (describe): yes R > L    Pain (Y/N) Y    Location: throat    Severity (Scale 1-10):

**ASSESSMENT:** Cellulitis in comfort Respiratory illness

**PLAN:** *Notify On call MD/PA/ NP if Temperature > 100.4, dry cough, respiratory distress, severe symptoms or signs of infection.*
1. Promptly place a surgical mask over the patient's face and nose
2. Test for Influenza A and B. If Positive, notify Provider and refer to URI: Colds/Flu/Sore Throat/Sinusitis Protocol
3. *Notify provider immediately if Influenza test Negative*    Inmates (R) lean drum
4. Place in a single cell or negative pressure room    pert E
5. Report to HSA for potential dorm cohort    lean pain
6. If need to be transported to ER – call in advance the EMS and hospital and notify of possible COVID-19

**EDUCATION:**    ___Instructed to cough or sneeze into their elbow or sleeve or cover coughs or sneezes with a tissue and throw the
tissue directly into the trash.
___Instructed in proper hand washing for a minimum of 20-seconds with soap and water.
___Instructed not to touch face, eyes, mouth and in proper mask usage.
___Instructed notify medical staff if symptoms persist or worsen.
___Instructed to maintain social distancing- 6 feet from those with symptoms

**NOTE: Reaffirm – Wash hands frequently especially after eating, coughing, sneezing, using the toilet.**

___Patient verbalized understanding of above instructions.

Interpreter Line Number, if required: NA

Nursing Signature: M Clark RN

M. Clark, RN
MVCF

Print/Stamp: _____

Date: 12/11/20

Time: 0825

Rev 3/2020, 6/2020

EXHIBIT-3

Kolmnela, Leom
ID: 92398054

03/14/1969
51 Years

Male

12/11/2020  8:09:41
GEO-MOSHANNON VALLEY CORR SHU

101 bpm
--/-- mmHg

|  |  |
|---|---|
| QRS : | 90 ms |
| QT / QTcBaz : | 360 / 466 ms |
| PR : | 168 ms |
| P : | 126 ms |
| RR / PP : | 596 / 594 ms |
| P / QRS / T : | -8 / -3 / 5 degrees |

Sinus tachycardia
Inferior infarct, age undetermined
Abnormal ECG

David M. Revak, D.O.
MVCF
DEC 21 2020

92398-054
KOLMNELA, LEOM
DOB: 03-14-1969
ARSD: 02-10-2020 MVCF

K. Gallaher, RN
MVCF
12/11/20

GE MAC2000
P/N 2009828-061

25mm/s   10mm/mV

Kolmnela, Leom
ID: 92398054

03/14/1969
51 Years

Male

05/11/2020  11:00:57

Location:
Room:
Order Number:
Indication:
Medication 1:
Medication 2:
Medication 3:

92398-054
KOLMNELA, LEOM
DOB:03-14-1969
ARSD: 02-10-2020  MVCF

EXHIBIT-4

| | |
|---|---|
| QRS : | 90 ms |
| QT / QTcBaz : | 394 / 445 ms |
| PR : | 162 ms |
| P : | 108 ms |
| RR / PP : | 774 / 779 ms |
| P / QRS / T : | 50 / 63 / 47 degrees |

Normal sinus rhythm
Normal ECG

David M. Deyak, D.O.
MVCC

MAY 11 2020

GE MAC2000       141       Test ID: 124       25mm/s       5.0mm/mV       40Hz       062SX 256 R7       Unconfirmed       1/1

12-20-23

EXHIBIT-5


**The GEO Group, Inc.**

December

COPY
COPIED
1:20-21
MB

# INMATE REQUEST TO A STAFF MEMBER
# PETICION DE INTERNOS PARA UN MIEMBRO INSTITUCIONAL

TO/PARA: MEDICAL

(NAME AND TITLE OF OFFICER/NOMBRE Y TITULO DEL OFFICIAL)

SUBJECT: STATE, COMPLETELY, BUT BRIEFLY, THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE,
AND WHAT YOU THINK SHOULD BE DONE. (GIVE DETAILS)
RAZON: ESTIPULE COMPLETO PERO BREVEMENTE EL PROBLEMA CON EL CUAL DESEA
ASSISTANCIA Y LO QUE DEBE SER HECHO. (DAR DETALLES)

I AM BOTHERING YOU THIS TIME TO ASK YOU
IF YOU PLEASE CAN GIVE ME ONE PRINTOUT
COPO OF MY MEDICAL RECORD FOR THE
MONTH OF DECEMBER 2020.

THANK YOU VARY MUCH
IN ADVANCE, AND I APOLOGIZE
BOTHERING YOU IN THIS HARD
TIMES

(USE OTHER SIDE OF PAGE IF MORE SPACE IS NEEDED.)
(USE EL ATRO LADO DE LA HOJA ES MAS ESPACIO ES NECESITADO.)

NAME/NOMBRE: LEOM KOLMNELIA    No./Numero: 92398-054

CASE MANAGER: HERTLEIN    DATE: 12-20-20

WORK ASSIGNMENT/ASIGNACION DE TRABAJO: KITCHON.    UNIT/UNIDAD: C2-27U.

NOTE: If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently. You will be
interviewed, if necessary, in order to satisfactorily handle your request. Your failure to specifically state your problem may
result in no action being taken.
NOTA: Si usted sigue las instrucciones en preparar su peticion, puede ser dispuesta mas rapida y inteligentemente. Usted sera
entrevistado si es necesario para poder manejar su peticion satisfactoriamente. Su negligencia en declarar su problema
especificamente puede resultar en que no se tome alguna accion.

DISPOSITION: (DO NOT WRITE IN THIS SPACE)    REMINDER:
DATE/FECHA:
DISPOSICION: (NO ESCRIBA EN ESTE ESPACIO)    THERE IS A CHARGE OF .10 CENTS PER
PAGE FOR ANY PAGES OVER 180.

WE RECIEVED YOUR REQUEST FOR
RECORDS. RECORDS WITH BE FORTH
COMING. Within 45 days

RECEIVED
12-22-20

Officer/Official

IM-004 ATTACHMENT A

MVCC PS IM-004  10/2005    Page 1 of 1


05/10/2021

EXHIBIT-6

March 18, 2021

# OKU CLINIC

**SECOND OPINION**

80 Lakeview Court
Richmond, IN 47374
USA

**Patient: LEOM KOLMNELA**

**DOB: 03/14/1969**

**Address: GEO-MOSHANNON VALLEY CORR SHU, PA**

OFFICE
**765.488.1979**

FAX
**765.488.1980**

WEBSITE
**OKUCLINIC.ORG**

The above patient's situation has been presented to me by his family with the purpose of reviewing his medical records of the past year and offer my medical opinion in regards to any concerns that may risk his life while incarcerated.

The documentation provided include: Notes dated as 02/14/2020 with associated physical exam, lab check up and findings from other radiological studies performed around that time for a scheduled routine visit, and the notes dated on 12/03/2020 in which patient was seen for severe chest pain and coughing. The work up included Covid-19 testing which returned negative, and an EKG which showed a long R wave in lead V2, minimal depression in I and aVL leads. Combining his major complaint of chest pain and such EKG finding, the concern is very high that patient has suffered a myocardial infarction. In further examination of the records provided to me, I did not see any further cardiac work up, such as troponin level, repeat of EKG, a chest CT (although CXR was done but no report available) and most importantly a cardiac catheterization.

The above opinion is unbiased and is based only on the facts provided in the medical records of Mr. Kolmnela.

Thank you for giving me this opportunity and please feel free to contact me if any questions.

Sincerely Yours,

Lindita Coku, MD
914-343-5456
lindita.coku@cokuclinic.org

EXHIBIT-7

---------------------------------------------------------------------------------------------

FROM: 92398054
TO: LSCI Medical
SUBJECT: ***Request to Staff*** KOLMNELA, LEOM, Reg# 92398054, ALF-U-B
DATE: 04/12/2021 10:21:19 PM

To:
Inmate Work Assignment: N/A

I am writing you this time to ask for a heart check. Four months ago, in Moshannon Valley, I have been detected some kind of hear infarct as you can see in my medical record. I feel chest pain time to time, and I am waking up during the nights with fast heart beats and with abrupt sweats. Please add me to the fastest appointment you can to check my heart.

I apologize for any inconvenience this may cause.
Thank you very much.
Sincerely.
Leom

EXHIBIT-8

# MALE PATTERN RISK SCORING

| Register Number: | 92398-054 | Date: | 4/18/2021 |
|---|---|---|---|
| Inmate Name: | Kolmnela, Leom | | |

| MALE RISK ITEM SCORING | CATEGORY | GENERAL SCORE | Enter Score | VIOLENT SCORE | Enter Score |
|---|---|---|---|---|---|
| **1. Current Age**  51-60<br>Click on gray dropdown box to select, then click on dropdown arrow | > 60 | 0 | 7 | 0 | 4 |
| | 51-60 | 7 | | 4 | |
| | 41-50 | 14 | | 8 | |
| | 30-40 | 21 | | 12 | |
| | 26-29 | 28 | | 16 | |
| | < 26 | 35 | | 20 | |
| **2. Walsh w/Conviction**  No | No | 0 | 0 | 0 | 0 |
| | Yes | 1 | | 0 | |
| **3. Violent Offense (PATTERN)**  No | No | 0 | 0 | 0 | 0 |
| | Yes | 5 | | 5 | |
| **4. Criminal History Points**  0 - 1 Points | 0 - 1 Points | 0 | 0 | 0 | 0 |
| | 2 - 3 Points | 8 | | 4 | |
| | 4 - 6 Points | 16 | | 8 | |
| | 7 - 9 Points | 24 | | 12 | |
| | 10 - 12 Points | 32 | | 16 | |
| | > 12 Points | 40 | | 20 | |
| **5. History of Escapes**  None | None | 0 | 0 | 0 | 0 |
| | > 10 Years Minor | 2 | | 1 | |
| | 5 - 10 Years Minor | 4 | | 2 | |
| | < 5 Years Minor/Any Serious | 6 | | 3 | |
| **6. History of Violence**  None | None | 0 | 0 | 0 | 0 |
| | > 10 Years Minor | 1 | | 1 | |
| | > 15 Years Serious | 2 | | 2 | |
| | 5 - 10 Years Minor | 3 | | 3 | |
| | 10 - 15 Years Serious | 4 | | 4 | |
| | < 5 Years Minor | 5 | | 5 | |
| | 5 - 10 Years Serious | 6 | | 6 | |
| | < 5 Years Serious | 7 | | 7 | |
| **7. Education Score**  Not Enrolled | Not Enrolled | 0 | 0 | 0 | 0 |
| | Enrolled in GED | -2 | | -1 | |
| | HS Degree / GED | -4 | | -2 | |
| **8. Drug Program Status**  No Need | No DAP Completed | 0 | -9 | 0 | -3 |
| | NRDAP Complete | -3 | | -1 | |
| | RDAP Complete | -6 | | -2 | |
| | No Need | -9 | | -3 | |
| **9. All Incident Reports   (120 months)**  0 | 0 | 0 | 0 | 0 | 0 |
| | 1 | 1 | | 1 | |
| | 2 | 2 | | 2 | |
| | > 2 | 3 | | 3 | |
| **10. Serious Incident Reports  (120 months)**  0 | 0 | 0 | 0 | 0 | 0 |
| | 1 | 2 | | 2 | |
| | 2 | 4 | | 4 | |
| | > 2 | 6 | | 6 | |
| **11. Time Since Last Incident Report**  12+ months or no incidents | 12+ months or no incidents | 0 | 0 | 0 | 0 |
| | 7-12 months | 2 | | 1 | |
| | 3-6 months | 4 | | 2 | |
| | <3 | 6 | | 3 | |
| **12. Time Since Last Serious Incident Report**  12+ months or no incidents | 12+ months or no incidents | 0 | 0 | 0 | 0 |
| | 7-12 months | 1 | | 1 | |
| | 3-6 months | 2 | | 2 | |
| | <3 | 3 | | 3 | |
| **13. FRP Refuse**  NO | NO | 0 | 0 | 0 | 0 |
| | YES | 1 | | 1 | |
| **14. Programs Completed**  0 | 0 | 0 | 0 | 0 | 0 |
| | 1 | -2 | | -1 | |
| | 2 - 3 | -4 | | -2 | |
| | 4 - 10 | -6 | | -3 | |
| | > 10 | -8 | | -4 | |
| **15. Work Programs**  0 Programs | 0 Programs | 0 | 0 | 0 | 0 |
| | 1 Program | -1 | | -1 | |
| | >1 Program | -2 | | -2 | |
| **Total Score (Sum of Columns)** | | General: | -2 | Violent: | 1 |
| **General/Violent Risk Levels** | | General: | Minimum | Violent: | Minimum |
| **OVERALL MALE PATTERN RISK LEVEL** | | | **Minimum** | | |

For more information about

*Lead By Example & Reverse The Trend:*

www.leadbyexample-reversethetrend.org

Special Thanks:

Antonio Hendrickson

7/10 Unit Team

Executive Staff

---

Metropolitan Correctional Center

Recognition Ceremony

for



LEAD BY EXAMPLE
&
REVERSE THE TREND
SELF-IMPROVEMENT PROGRAMS

"Do the right thing when no one is looking"

June 26, 2019

150 Park Row
New York, NY 10007
L. N'Diaye, Warden

EXHIBIT-8

# The Mission of Lead by Example

**LBE** is a dynamic self-help program created to help prepare males for adulthood with redirection and empowerment; enhanced communications and social skills; and assisting them in becoming positive, assertive, adults by attaining a better sense of self and awareness of their potential. This program encourages participants to develop greater self-worth, increase self-esteem, create and maintain healthy, supportive, respectful relationships with family and others.

## ~Program~

### MUSIC BY
JOSE LOPEZ

### Welcome
A. *Black, Case Manager*

### Staff Remarks
R. *Proto, Unit Manager*

### Words of Reflection
Class Participants

### Guest Speaker
A. *Hendrickson, Facilitator and Founder*

### Closing Remarks
Executive Staff

## Lead by Example Graduates of 7 South

ALEXANDER BARRY
ANTONIUS STEVEN
BROWN JOHN
BUTLER DENARD
CALLAZO HIRAM
CAVE ETHAN
CONTRERAS JOHNNY
DUPREY HECTOR
FELIPE JOHN
FERNANDEZ LEONARDO
FIGUEROA ANGEL
FUENTES MIGUEL
GARCIA DAVID
GRAY KARL
IRIZARRY JORGE
JONES JAFARI
KOLMNELA LEON
LOVELL SHERVINGTON
MABLE TEVIN
MONTES BRANDON
MONTOYA FREDDY
PENA ROBERT
POLK TERRELL
RAMIREZ ADONIS
RAMIREZ RONNY
REYES EFRAIN
REYES FRANKIE
RICHARDSON DAVID
RIVERA, JUSTIN
ROLON EDWIN
SANTIAGO JONATHAN
SHFANO VINCENT
SISNERO MARLON
TOWNSEND DOUGLAS
VILLALOBOS WALTER
WILLIS SHANNON
WILSON LEROY
YOUNG AARON
YOUNG ANTHONY
ZAPATA ARGEMIRO

EXHIBIT-6

EXHIBIT-10

---------------------------------------------------------------------------------------------

FROM: Ndreca, Justine
TO: 92398054
SUBJECT: RE: COVID-19 LEVELS IN ALBANIA
DATE: 05/15/2021 07:51:01 AM

Albania
5% of peak and falling
12 infections per 100K people reported last 7 days
Updated 2:33 PM PDT

COVID-19 infections are decreasing in Albania, with 51 new infections reported on average each day. That's 5% of the peak the highest daily average reported on February 10.

There have been 131,939 infections and 2,427 coronavirus-related deaths reported in the country since the pandemic began.

Daily reported trends

New infections
Dec 31
May 14
7-day average
Daily new infections
500
1k
Deaths
Dec 31
May 14
7-day average
Daily deaths
5
10
15
20

See our new vaccination tracker
With the latest statistics and information including vaccination eligibility from governments and health authorities around the world
Vaccination

Albania has administered at least 632,676 doses of COVID vaccines so far. Assuming every person needs 2 doses, that's enough to have vaccinated about 11.1% of the country's population.

 About this data
This vaccine rollout data is reported by the number of doses of coronavirus vaccines administered, not the number of people who have been vaccinated. Because most vaccines require two doses and many countries have different schedules to deliver the second dose, we don't know with this data how many people have ultimately received both doses.
Jan 12
Mar 13
May 12
120.958
61
0
500k
1M
Enough to give 2 doses to 20% of population
 to 10%

Leon Kolmnela
Reg# 9398-054
Federal Correctional Complex
Allenwood Low
P.O. Box 1000
White Deer, PA 17887

ISMP3
CDNY

UNITED STATES POSTAL SERVICE®

**CERTIFIED MAIL**®

FOR USE ONLY WITH IMpb SHIPPING LABEL

Label 3800-N, January 2014

PSN 7690-17-000-5606

UNITED STATES
POSTAL SERVICE ®

**PRIORITY MAIL**
★ ★

★ TRACKED ★
★ INSURED ★

For Domestic and International Use

Attn: PRO SE CLERK

◇92398-054◇
Hon Andrew Carter Jr
United States Court House
500 Pearl ST
Daniel Patrick Moynihan
NEW YORK, NY 10007
United States

1004

10007

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE



* LEGAL MAIL *

U.S. POST
WHITE DEE
17887
JU 25 21
AMOUNT

$0.0
R2305K13850