

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 27, 2021

**VIA ECF AND EMAIL**
The Honorable Andrew L. Carter Jr.
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: *United States* v. *Leom Kolmnela*, 15 Cr. 685 (ALC) / 18 Cr. 554 (ALC)

Dear Judge Carter:

The Government respectfully opposes defendant Leom Kolmnela's motion for reconsideration of this Court's decision from March 2021 denying his prior application for compassionate release from prison under Title 18, United States Code, Section 3582(c)(1)(A). The claims on which Kolmnela bases his reconsideration motion are insufficient to carry his burden of showing that there are "extraordinary and compelling reasons" for reducing the ten-year prison sentence (*see* 18 U.S.C. § 3582(c)(1)(A)) that this Court imposed to punish Kolmnela for his role as the leader of an international drug trafficking organization in orchestrating international shipments of 30 kilograms of methamphetamine and 114 kilograms of cocaine, collectively worth millions of dollars in street value. In any event, even if Kolmnela could clear that threshold obstacle (which he cannot), his motion also fails to establish, as his burden, any valid basis for revisiting this Court's reasonable and appropriate determination that the sentencing factors set forth in 18 U.S.C. § 3553(a) weigh against granting any reduction of his prison term. For these reasons, and those that follow, Kolmnela's reconsideration motion should be denied.[1]

## BACKGROUND

**A. Kolmnela's Offense Conduct**

Leom Kolmnela, a 52-year-old citizen of Albania, was a leader of an international drug trafficking organization that transported multi-kilogram shipments of methamphetamine and cocaine to Australia for distribution. The criminal narcotics trafficking charges that were filed against Kolmnela in this case stem from law enforcement seizures of a shipment of 30 kilograms

---

[1] Throughout this submission, "D.E. [Number]" refers to a docket entry in this case; "PSR" refers to the final Presentence Investigation Report filed by the Probation Department in this case; "Ex. A" refers to Exhibit A to the Government's sealed letter of January 11, 2021 in this case, consisting of medical records from 2020 for Kolmnela that were provided by the Federal Bureau of Prisons (the "BOP"); "Ex. B" refers to BOP medical records from 2021 for Kolmnela attached as Exhibit B under cover of a separate letter requesting that those records be filed under seal.

of methamphetamine and a separate shipment of 114 kilograms of cocaine that Kolmnela orchestrated as part of his leadership of that drug organization, collectively worth millions of dollars in street value.

***The 30-Kilogram Methamphetamine Seizure***. On July 16, 2014, Kolmnela exported about 30 kilograms of methamphetamine from Los Angeles, California to Australia. The methamphetamine, in two 15-kilogram packages, was seized by Australian law enforcement from a hidden compartment in the trunk of a vehicle on September 4, 2014.

***The 114-Kilogram Cocaine Seizure.*** In 2015, the United States Drug Enforcement Administration ("DEA") conducted an investigation that led to Kolmnela's arrest in the Southern District of New York. During the course of the investigation, the DEA made use of a confidential source posing as an international drug trafficker ("CS-1"), and another confidential source posing as a boat captain in the business of transporting drug shipments ("CS-2") via a 60-foot vessel (the "Vessel"). In February 2015, CS-1 participated in several telephone conversations with an employee of Kolmnela's drug organization, Mercedes Amelia Paez Brochero, who was seeking to hire a marine vessel on behalf of Kolmnela to transport a shipment of cocaine from Colombia to Australia. During these conversations, Brochero arranged to meet in Aruba with CS-1 in order to inspect the Vessel.

On February 19, 2015, Brochero met in Aruba with CS-1 (posing as an international drug trafficker) and CS-2 (posing as the boat captain of the Vessel). During the meeting, Brochero inspected the Vessel in the presence of CS-1 and CS-2. CS-1 introduced CS-2 to Brochero as the purported boat captain of the Vessel. Brochero said her boss, "Leo," who was later identified as defendant Leom Kolmnela, was based in the United States and wanted to hire a marine vessel to transport a large shipment of cocaine from Colombia to Australia. Brochero used her cellphone to call Kolmnela, had a brief conversation with Kolmnela in which Brochero said that the Vessel was suitable to hire, and then handed her cellphone to CS-1, who spoke directly with Kolmnela. During CS-l's conversation with Kolmnela, Kolmnela agreed to pay CS-1 and CS-2 a transportation fee of about $5,000 per kilogram of cocaine to be transported (which would equate to a total transportation fee of $570,000 to ship 114 kilograms of cocaine).

On April 8, 2015, CS-1 participated in a conversation with Brochero via encrypted WhatsApp communications with CS-1 in which Brochero stated that the cocaine to be shipped via the Vessel would be delivered at a location in Colombia the next morning. On April 9, 2015, a vehicle arrived at the agreed upon location in Colombia. The vehicle was driven there by an individual later identified as Leke Lleshi, a/k/a "El Calbo," who was in the driver's seat of the vehicle, and the vehicle had several passengers, including Brochero and an individual who exited the vehicle with two suitcases ("FNU LNU"). FNU LNU delivered the two suitcases to CS-1 at the agreed upon location in Colombia on behalf of Brochero and her boss, Kolmnela. Colombian law enforcement officials subsequently seized and searched the suitcases, which contained approximately 114 brick-shaped packages containing approximately 114 kilograms of cocaine. During a subsequent WhastsApp conversation, CS-1 told Brochero that the cocaine had been received, and that CS-2 would commence the shipment of the cocaine from Colombia to Australia via the Vessel. In reality, however, the cocaine was never loaded onto the Vessel, and the Vessel never left for Australia.

Based on the pretense that the Vessel was at sea, on its way to Australia with the cocaine shipment, CS-1 arranged to have Brochero set up a meeting in the Southern District of New York between CS-1 and Brochero's boss, Kolmnela, in order to discuss payment of the transportation fee for the cocaine shipment. Specifically, CS-1 said that CS-1 planned to be in New York City during the third week of June 2015, and asked Brochero to arrange a meeting in New York City between CS-1 and Kolmnela to discuss their current and future business.

On June 18, 2015, at the direction of law enforcement, CS-1 met with Kolmnela at a restaurant in New York, New York. During the meeting, Kolmnela introduced himself as "Leo" and discussed the cocaine that Kolmnela had agreed to pay CS-1 and CS-2 to ship via the Vessel from Colombia to Australia. For example, Kolmnela said that "El Calbo," which CS-1 understood as a reference to Lleshi, had failed Kolmnela, in that Kolmnela had been hoping to ship over 300 kilograms via the Vessel to Australia, and Lleshi had only supplied about 114 kilograms for the shipment. Kolmnela also discussed his drug trafficking business around the globe. For example, CS-1 asked if Kolmnela's business involved the trafficking of clothing impregnated with "perico," which is slang in Spanish for cocaine. Kolmnela acknowledged that he had done so in the past, but he did not need to do so anymore because Kolmnela expected to make future shipments using CS-1 and CS-2's shipment services via the Vessel. Kolmnela also said he liked to do business in Australia, where the market price of "la mercancia," which is also slang in Spanish for cocaine, is higher than in other countries. Kolmnela discussed the payment of the $570,000 transportation fee for the cocaine shipment referenced above. For example, CS-1 said that CS-1 needed to receive a substantial portion of the transportation fee before the Vessel arrived in Australia. Kolmnela agreed to meet again with CS-1 in New York to provide a down payment of about $300,000 in cash towards the transportation fee.

On June 19, 2015, at the direction of law enforcement, CS-1 had a further meeting with Kolmnela at a hotel in New York, New York. During the meeting, with respect to the transportation fee, Kolmnela agreed to pay the fee by making several wire transfers of tens of thousands of dollars to CS-1, and to have his associates in Colombia provide thousands of dollars in cash (in pesos) in Colombia to CS-1. At the conclusion of this meeting, Kolmnela was placed under arrest by DEA agents and he was subsequently charged in this case, presented in the Southern District of New York and detained pending trial.

**B. Kolmnela's Guilty Plea**

On September 18, 2018, Kolmnela pleaded guilty to Count One of Indictment 15 Cr. 685 (ALC), which charged him with conspiring to possess with the intent to distribute five kilograms and more of cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506 and 21 U.S.C. § 960(b)(1)(B), based on his role in orchestrating the shipment of 114 kilograms of cocaine that was seized by Colombian law enforcement. As part of the same plea proceeding, Kolmnela resolved a separate criminal case that had been filed against him in the United States District Court for the Central District of California in connection with his role in orchestrating the shipment of 30 kilograms of methamphetamine that was seized by Australian law enforcement. In connection with the California case, which was transferred to this Court, Kolmnela pleaded guilty to Count One of

Indictment 18 Cr. 554 (ALC), which charged him with exporting approximately 30 kilograms of methamphetamine from the United States, in violation of 21 U.S.C. §§ 953(c), 960(a)(1), and 960(b)(1)(H), and of 18 U.S.C. § 2. Each of the charges to which Kolmnela pleaded guilty carried a mandatory minimum prison sentence of ten years.

### C. Kolmnela's Sentencing

After Kolmnela pleaded guilty to Count One of Indictment 15 Cr. 685 (ALC) based on the 114-kilogram cocaine seizure and Count One of Indictment 18 Cr. 554 (ALC) based on the 30-kilogram methamphetamine seizure, the parties jointly moved to vacate Kolmnela's guilty plea to the former charge as no longer valid in light of the Second Circuit's intervening decision in *United States* v. *Prado*, 333 F. 3d 121 (2d Cir. 2019), with the proviso that the Court would be permitted to consider the misconduct underlying the former charge as relevant conduct in sentencing Kolmnela on the latter charge, which remained valid. (Sent'g Tr. (D.E. 93) at 1-6). The Court granted that joint motion. (*Id.*)

On December 6, 2019, the Court sentenced Kolmnela to ten years in federal prison on Count One of Indictment 18 Cr. 554 (ALC) to be followed by five years of supervised release, "[e]ven though it is likely that Mr. Kolmnela will be deported" after serving that prison term. (*Id.* at 20).

### D. Kolmnela's Custodial Status

Kolmnela has been in BOP custody since his arrest in June 2015, and has served about six years and two months of his 10-year prison sentence thus far, meaning his instant motion seeks a 38% reduction of his prison sentence. Kolmnela is presently incarcerated at the BOP's low security federal correctional institution in Allenwood, Pennsylvania ("FCI Allenwood Low"). According to the BOP, Kolmnela's anticipated release date is December 26, 2023 assuming he receives good time credit.

### E. Kolmnela's Original Compassionate Release Motion

On January 5, 2021, after exhausting his administrative remedies within BOP, Kolmnela filed a motion to reduce his prison sentence pursuant to 18 U.S.C. § 3582(c)(a)(1)'s compassionate release provision, based on claims that he was at heightened risk of suffering severe complications if he were to COVID-19 in prison (principally because of his pre-existing nasal allergies and high cholesterol) and claims that he should be released from prison so that he could care for his wife, who was suffering from unpredictable fainting spells. The Government opposed the motion on three grounds. *First*, the Government argued that Kolmnela's motion failed to show, as is his burden, that he falls into the narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release (18 U.S.C. § 3582(c)(1)(A)) because his BOP medical records showed that his pre-existing medical conditions were relatively mild and did not expose him to a heightened risk of severe COVID-19 complications, and because there was no evidence that his family (including his two sons, who were then 17 and 19 years old) were unable to cope with his wife's circumstances in his absence. *Second*, the Government argued that even if Kolmnela had satisfactorily made that threshold showing — which he had not — his early release

from prison would still be inappropriate because the factors set forth in 18 U.S.C. § 3553(a) that prompted this Court to sentence Kolmnela to ten years in prison still counseled in favor of adhering to that sentence, notwithstanding the risk of Kolmnela contracting COVID-19 in prison. *Lastly*, the Government argued that in any event, because Kolmnela would be taken into the custody of the United States Department of Homeland Security's Immigration and Customs Enforcement division ("ICE") for anticipated deportation proceedings that would likely result in his deportation, the relief that his motion sought would not necessarily address the alleged concerns cited as the claimed bases for the motion.

On March 8, 2021, this Court issued an Order denying Kolmnela's motion for compassionate release, ruling as follows:

> Kolmnela claims that his extraordinary family circumstances and health concerns establish extraordinary and compelling reasons justifying his release. Assuming this is true, the factors listed in 18 U.S.C. § 3553(a) counsel against release. At the age of 45, he chose to engage in serious criminal conduct despite other economic opportunities available to him. There was—and is—a strong need to provide general and specific deterrence in this case. The motion is denied.

(D.E. 25 at 2/3).

### F. Kolmnela's Receipt of Moderna's COVID-19 Vaccine

Kolmnela is now 52 years old. His BOP medical records for 2021 reflect that BOP medical staff at FCI Allenwood Low have administered both doses of Moderna's COVID-19 vaccine to Kolmnela. (*See* Ex. B at 39, 55/72). Specifically, BOP medical staff injected Kolmnela with the first dose of the Moderna vaccine on July 22, 2021, and injected him with the second dose on August 18, 2021. (*See id.*). In addition, Kolmnela is incarcerated at a BOP facility with relatively low numbers of COVID-19 infections. As of today, FCI Allenwood Low, which houses approximately 895 inmates including Kolmnela, has reported that zero of its inmates and zero of its staff members tested positive in the prison's most recent round of COVID-19 testing. In the 17 months that have passed since the beginning of the COVID-19 pandemic, FCI Allenwood Low reportedly has had zero inmate or staff fatalities from COVID-19, and a total of 237 inmates and 21 staff members test positive for COVID-19, all of whom have since recovered. To prevent further spread or severe harm from COVID-19, the BOP has been actively working to administer COVID-19 vaccines to inmates and BOP staff members in the complex of prisons in which FCI Allenwood Low is included, and has fully vaccinated approximately 1,654 inmates (including Kolmnela) and approximately 426 staff members thus far.

### G. Kolmnela's BOP Medical Records

Kolmnela's BOP medical records reveal the following of relevance to the instant motion. On December 9, 2020, Kolmnela requested a sick call appointment, claiming he had throat pain and a heavy cough. On December 11, 2020, Kolmnela was examined by BOP medical staff, was tested for COVID-19 and strep throat, and was proscribed 640 milligrams of Tylenol every six

hours for 30 days for his symptoms.  (*See* Ex. A at 58, 65-66/177).  According to the lab results from those tests, Kolmnela tested negative for COVID-19 but positive for strep throat, and he was subsequently prescribed 500 milligrams of the antibiotic amoxicillin per day for 10 days to treat his strep.  (*See id.* at 58, 99-100/177).  During a follow-up physical examination on December 15, 2020, Kolmnela was asked about and denied having any cardiopulmonary issues (specifically, he denied having any chain pain, shortness of breath, cough, or coughing up blood), he was asked about and denied having other symptoms of COVID-19, his heart rate was regular, and he was calm and cooperative.  (*See id.* at 59-60/177).

Prior to coming down with strep in December 2020, BOP medical staff gave Kolmnela an electrocardiogram (known as an "ECG" or "EKG") test on May 11, 2020 to evaluate his heart, the results of which were normal.  (*See* Ex. A at 108/117).  On December 11, 2020, which was the same day on which Kolmnela tested positive for strep (*see id.* at 58, 65-66, 99-100/177), BOP medical staff gave Kolmnela a further ECG test, which came back with abnormal results indicating that he had an "inferior infarct, age undetermined" (*id.* at 106/117), suggesting that he might have had a heart attack (known as myocardial infarction) in the bottom (or inferior) portion of his heart at some point since his May 2020 ECG with normal results.  After recovering from the strep, however, BOP medical staff gave Kolmnela an additional ECG test on June 10, 2021, which saw a return to normal results.  (*See* Ex. B 6-9, 60/72).

Although Kolmnela tested negative for COVID-19 three separate times on December 11, 2020, March 12, 2021, and March 26, 2021 according to BOP medical records (*see* Ex. A at 58, 65-66, 99-100/177; Ex. B at 38-39, 53/72), Kolmnela complained to BOP medical staff on June 15, 2021 that he believed he had contracted COVID-19 in December 2020 and had been experiencing chest pains and other symptoms ever since (*see* Ex. B at 62/72).  In response to those complaints, BOP medical staff gave Kolmnela a chest x-ray on June 15, 2021, the results of which indicated "No acute cardiopulmonary disease."  (*See* Ex. B at 62/72).  In addition, BOP medical staff gave Kolmnela a myocardial perfusion test (also known as a nuclear stress test) on July 13, 2021 to see how well blood was flowing through his heart, the results of which were normal, with no ischemia (that is, no signs of inadequate blood supply to the heart).  (*See* Ex. B at 3-4, 56-57/72).  Normal or near normal myocardial perfusion stress imaging (known as "MPI") suggests the absence of life-threatening coronary artery disease.

## **ARGUMENT**

In March 2021, this Court correctly ruled that a reduction of Kolmnela's ten-year prison sentence would be inappropriate in light of the sentencing factors set forth in 18 U.S.C. § 3553(a), and nothing has changed in the five months since then to warrant reconsideration of that ruling.  Kolmnela's reconsideration motion fails to demonstrate, as is his burden, that he falls into the narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release from prison.  It also fails to carry his burden of showing that the Section 3553(a) factors weigh in favor of reducing his sentence.  Accordingly, his motion should be denied.

A. **Applicable Law**

1. **The Standard for Compassionate Release**

Under Title 18, United States Code, Section 3582(c)(1)(A), as amended by the First Step Act, a district court "may not modify a term of imprisonment once it has been imposed" except as provided by statute. As relevant here, Section 3582(c)(1)(A)'s compassionate release provision states that a district court "may reduce the term of imprisonment" imposed as part of a defendant's sentence upon a motion by the Director of the BOP or by the defendant if the court finds, "after considering the factors set forth in section 3553(a) [of Title 18] to the extent they are applicable," that "extraordinary and compelling reasons warrant such a reduction" and that such a reduction "is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Although Section 3582(c)(1)(A) requires a threshold showing that there are "extraordinary and compelling reasons" for reducing a defendant's sentence to invoke the district court's authority to modify the sentence, the statute does not define "extraordinary and compelling reasons" (*see id.* § 3582(c)(1)(A)). The Second Circuit has held that district courts are free to "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States* v. *Brooker*, 976 F.3d 228, 230, 237 (2d Cir. 2020). Thus, a district court has broad discretion in considering what circumstances constitute extraordinary and compelling reasons. *See id.* Rehabilitation alone, however, "shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

"The existence of 'extraordinary and compelling reasons' for a reduction does not mean that a district court *must* release the defendant." *See United States* v. *Madoff*, No. 09 Cr. 213, Dkt. 230 at 9 (S.D.N.Y. June 4, 2020) (Chin, J.) (Judge Chin's emphasis). "Rather, section 3582(c)(1)(A) provides that a court 'may' reduce a sentence if 'extraordinary and compelling circumstances' are shown, and thus a district court has the discretion to grant or deny a request for compassionate release even if a defendant is medically eligible." *See Madoff*, No. 09 Cr. 213, Dkt. 230 at 9 (citing authority). "If a defendant qualifies for a reduction, the court must decide whether to grant the reduction by weighing the factors set forth in section 3553(a), to the extent they are applicable." *See id.* (citing authority).

As the moving party seeking a sentence reduction, the defendant bears of the burden of proving that he is entitled to relief under 18 U.S.C. § 3582(c)(1)(A). *See United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992); *Madoff*, No. 09 Cr. 213, Dkt. 230 at 9.

2. **The Standard for Reconsideration**

"'[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *United States* v. *Daugerdas*, No. 09 Cr. 581 (WHP), 2020 WL 4931988, at *1-2 (S.D.N.Y. Aug. 18, 2020) (quoting *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (internal quotation marks omitted)). While the Federal Rules of Criminal Procedure do not specifically provide for reconsideration motions, such motions have traditionally been allowed in criminal cases within the Second Circuit, and district courts have applied the governing civil standard to reconsideration motions in criminal cases. *See United States* v. *Baldeo*, 2015 WL

252414, at *1 (S.D.N.Y. Jan. 20, 2015); *see also, e.g.*, *United States* v. *Alvarez-Estevez*, 2014 WL 12681364, at *1 n.1 (S.D.N.Y. Nov. 6, 2014). A motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader* v. *CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Reconsideration is not an invitation for parties to "treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings." *De los Santos* v. *Fingerson*, 1998 WL 788781, at *1 (S.D.N.Y. Nov. 12, 1998). A motion for reconsideration is "neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced." *AP* v. *United States DOD*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005). A reconsideration motion should be denied if the moving party "merely offers substantially the same arguments he offered on the original motion." *United States* v. *Kerik*, 615 F. Supp. 2d 256, 276 n.27 (S.D.N.Y. 2009) (internal quotation marks omitted). "The standard for reconsideration is strict, and ultimately, the decision is within the sound discretion of the trial court." *McGraw-Hill Glob. Educ. Holdings, LLC* v. *Mathrani*, 293 F. Supp. 3d 394, 397-98 (S.D.N.Y. 2018).

### B. <u>Discussion</u>

Kolmnela's motion for reconsideration of the Court's March 2021 ruling denying his prior application for compassionate release from prison should be denied for at least two independent reasons. *First*, his motion fails to establish "extraordinary and compelling" reasons warranting his early release. *Second*, as this Court correctly ruled in March, his release would be inconsistent with the factors set forth in 18 U.S.C. § 3553(a).

### 1. **Kolmnela Has Failed to Establish "Extraordinary and Compelling" Reasons Justifying His Early Release From Prison**

Kolmnela bears the burden of proving that "extraordinary and compelling reasons" exist to justify a reduction of his prison sentence. *See United States* v. *Broadus*, 17 Cr. 787 (RJS), 2020 WL 3001040, at *2 (S.D.N.Y. June 4, 2020) (Sullivan, J.) (denying defendant's compassionate release motion in part because he "has not carried his heavy burden of demonstrating that extraordinary and compelling reasons merit a significant reduction in his sentence"). This Kolmnela has failed to do.

Kolmnela argues that his immediate release from prison is warranted based primarily on claims that he is at a heightened risk of suffering severe complications if he were to contract COVID-19 or a variant of the virus in prison because his December 2020 ECG results indicate that he suffered a heart attack (or myocardial infarction) in the lower (or inferior) portion of his heart. These claims are meritless.

As an initial matter, because Kolmnela has now been fully vaccinated against COVID-19, the risk of him contracting COVID-19 cannot present an extraordinary or compelling reason for reducing his sentence. Kolmnela recently received both doses of Moderna's COVID-19, and thus he is now fully inoculated against COVID-19. As the United States Centers for Disease Control

and Prevention (the "CDC") has stated, "[b]ased on evidence from clinical trials, in people aged 18 years and older, the Moderna vaccine was 94.1% effective at preventing laboratory-confirmed COVID-19 infection in people who received two doses and had no evidence of being previously infected," and the "vaccine was also highly effective in clinical trials at preventing COVID-19 among people of diverse age, sex, race, and ethnicity categories and among people with underlying medical conditions." CDC Website available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html (last visited August 27, 2021). In light of the effectiveness of the COVID-19 vaccine, courts in this Circuit have ruled that the risk of infection from COVID-19 is no longer an extraordinary or compelling reason for reducing the prison sentences of fully vaccinated defendants like Kolmnela. *See, e.g.*, *United States* v. *Kosic*, No. 18 Cr. 30 (PAC), 2021 WL 1026498, at *2 (S.D.N.Y. Mar. 17, 2021) ("courts in this circuit have found that vaccination mitigates the risk an inmate faces from COVID-19 to the point that his health conditions weighing in favor of release are no longer extraordinary and compelling" (collecting cases)).[2]

Furthermore, the December 2020 ECG results that Kolmnela cites were aberrational, are not indicative of any severe heart disease, and thus are not sufficiently "extraordinary and compelling" to justify his early release from prison. In the Government's opposition to Kolmnela's initial compassionate release application, the Government demonstrated that neither Kolmnela's age nor any of the pre-existing medical conditions that Kolmnela originally cited as alleged justifications for his early release was recognized by the CDC as creating an increased risk of severe complications from COVID-19. (*See* D.E. 19 at 9/12). Kolmnela could have cited the December 2020 ECG results in support of that prior application seeking his early release, but he chose not to do so, betraying that they are simply not as concerning as he now claims.[3] As shown above, those ECG results were taken on the same day in December 2020 on which Kolmnela tested positive for strep throat, which may have corrupted the ECG results. (*See supra* at 5-6). In addition, Kolmnela's prior and subsequent ECG results from his ECG in May 2020 and his ECG in June 2021 both reflected normal outcomes, suggesting an absence of any serious heart issues. (*See supra* at 5-6). Moreover, Kolmnela's June 2021 chest x-ray results indicated that he had no

---

[2] *See also, e.g., United States* v. *Johnson*, No. 94 Cr. 631 (PGG), 2021 WL 640054, at *5 (S.D.N.Y. Feb. 18, 2021) (finding no extraordinary and compelling reasons where obese inmate had received first dose of vaccine and was expected to receive second dose in coming weeks); *United States* v. *Pabon*, No. 17 CR. 312 (JPC), 2021 WL 603269, at *3 (S.D.N.Y. Feb. 16, 2021) ("Any risk that Pabon may face from the spread of COVID-19 at Allenwood Low has been greatly reduced because he is now fully vaccinated.")); *United States* v. *Brown*, No. 16 Cr. 436 (KMW), D.E. 375 at 4-5 (S.D.N.Y. Mar. 26, 2021) ("Because Brown will soon be fully vaccinated, any risk that he may become severely ill from COVID-19 will be reduced significantly.").

[3] Kolmnela filed his initial motion for compassionate release on January 5, 2021. (D.E. 17). Along with its opposition to that motion filed January 11, 2021 (D.E. 19), the Government also filed under seal an accompanying set of BOP medical records for Kolmnela that included his December 2020 ECG results. (*See* Ex. A at 106/117). On January 28, 2021, Kolmnela filed a reply in support of his compassionate release motion. (D.E. 24). Although Kolmnela was aware of the December 2020 ECG results when he filed those moving and reply papers, neither presented any arguments for his early release from prison based on those ECG results.

acute cardiopulmonary disease, and his July 2021 myocardial perfusion test results indicated that blood was flowing normally through his heart, and that there were no signs of inadequate blood supply to his heart. (*See supra* at 5-6).

As a result, Kolmnela has not shown that he suffered from any of the types of severe heart issues or other pre-existing medical conditions that are recognized by the CDC as creating a heightened danger of severe complications from COVID-19. In any event, even if Kolmnela had any such comorbidities, he is now fully inoculated against COVID-19 and thus has substantial if not complete protection against contracting or suffering any severe complications from COVID-19. Because Kolmnela has been adequately protected from the potential dangers of contracting COVID-19 in prison, the ongoing COVID-19 pandemic is not a sufficiently extraordinary or compelling reason for his early release from prison.

In any event, because Kolmnela will be taken into ICO custody for deportation proceedings upon his release from BOP custody, the relief that his motion seeks will not necessarily alleviate his alleged concerns about COVID-19. Kolmnela is a citizen of Albania. As the Court noted at Kolmnela's sentencing, Kolmnela will likely be deported following the completion of his prison sentence in this case in light of the nature of his narcotics conviction. The Government has been informed by ICE officials that ICE has lodged a detainer with the BOP for Kolmnela that would result in Kolmnela being taken into ICE custody upon his release from BOP custody in connection with anticipated deportation proceedings. Accordingly, even if Kolmnela's request for compassionate release from prison were granted, that does not necessarily mean he would end up being housed somewhere safer from potential COVID-19 exposure than FCI Allenwood Low.

As fall-back claims, Kolmnela argues that he should be granted early release from prison based on a slew of allegations, including assertions about his wife's circumstances, assertions about his rehabilitation in prison, assertions that the conditions of his incarceration have been harsher than the Court expected when the Court sentenced him to ten years in prison, and assertions that his immigration status will result in his effective sentence being unfairly longer than it would be if he were a citizen of the United States. All of these allegations either repeat arguments that were presented in his prior compassionate release motion and rejected through the Court's denial of that motion, or represent new arguments that he could have but failed to present in that prior motion. In either case, these arguments are not appropriate grounds for reconsideration of the Court's denial of his compassionate release motion, *see AP* v. *United States DOD*, 395 F. Supp. 2d at 19 (a reconsideration motion is "neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced"), and in any event, none of them is sufficiently "extraordinary and compelling" to justify his early release from prison.

**2. Kolmnela's Early Release Should Be Denied Based on the Section 3553(a) Factors**

Even if Kolmnela had adequately established "extraordinary and compelling reasons" allowing the Court to reduce his prison sentence if appropriate — which is not the case — the Court should still adhere to its prior determination that a ten-year prison sentence is necessary for Kolmnela based on the sentencing factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A). In March 2021, in denying Kolmnela's prior application for compassionate release

from prison, this Court correctly decided that "the factors listed in 18 U.S.C. § 3553(a) counsel against release" (D.E. 25 at 2/3) because "[a]t the age of 45, [Kolmnela] chose to engage in serious criminal conduct despite other economic opportunities available to him" (*id.*), and because "[t]here was—and is—a strong need to provide general and specific deterrence in this case" (*id.*). Kolmnela has not shown, and cannot show, that anything has changed in the five months that have passed since that time to warrant reconsideration of that ruling. The ten-year prison sentence that this Court imposed for Kolmnela's role, as a leader of an international drug trafficking organization, in organizing massive shipments of 30 kilograms of methamphetamine and 114 kilograms of cocaine, was and remains just.

Kolmnela's drug trafficking conduct across was and remains disturbing. He participated in separate endeavors to transport copious amounts of cocaine and methamphetamine worth millions of dollars for sale and, implicitly, eventual consumption by drug users. Both are extremely dangerous drugs and Kolmnela was involved in their planned distribution in bulk. He plainly undertook these actions without regard for the tremendous harm that the drugs could cause, particularly when loosed into the community in such quantities. Moreover, the execution of the two schemes bespeaks a high degree of planning and care. Each of the schemes involved shipping narcotics internationally. The cocaine scheme involved the chartering of a vessel, the embedding of cocaine inside clothing, and the use by Kolmnela of multiple cellphones; the methamphetamine scheme involved the use of a hidden compartment to store the drugs. Nor did Kolmnela's conduct in connection with either offense constitute a mistake of youth — he was at least 45 years old during the charged conduct. Neither does either of Kolmnela's offenses appear to be a crime of economic desperation — the Probation Department reported that Kolmnela and his wife owned multiple businesses, real estate properties and assets. (*See* PSR at ¶ ¶50, 66-71). In short, Kolmnela's crimes created a risk of extreme harm to the community, were utterly needless, and reflected a high degree of planning and sophistication.

Under the circumstances a ten-year prison sentence was and remains appropriate and necessary to meet Section 3553(a)'s goals of ensuring that his sentence reflects the seriousness of his criminal conduct, promotes respect for the law, provides just punishment for his offense, and adequately deters him and others who might wish to emulate his crime in pursuit of illicit profits. *See* 18 U.S.C. § 3553(a)(2)(A)-(B). Reducing Kolmnela's sentence to "time served" per his request, which would equate to a 38% reduction of his ten-year prison term, would undermine those sentencing goals, particularly given the weakness of the alleged grounds that he cites as purported justifications for his early release.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should deny defendant Leom Kolmnela's motion for reconsideration of this Court's March 2021 ruling denying his prior compassionate release application.

                                      Respectfully submitted,

                                      AUDREY STRAUSS
                                      United States Attorney

By:     /s/_____
           Samson Enzer
           Assistant United States Attorney
           (212) 637-2342

cc: Leom Kolmnela, *pro se*
    BOP Inmate No. 92398-054
    FCI Allenwood Low
    Federal Correctional Institution
    P.O. Box 1000
    White Deer, PA 17887